Charles C. WHITLATCH *v.* SOUTHLAND LAND &
DEVELOPMENT; The Travelers Insurance Company

CA 03-736                                      141 S.W.3d 916

Court of Appeals of Arkansas
Division IV
Opinion delivered January 21, 2004

Harrelson, Moore & Giles, by: Greg Giles, for appellant.

Robert H. Montgomery, for appellee.

TERRY CRABTREE, Judge. The Workers' Compensation Commission affirmed and adopted the opinion of an Administrative Law Judge, who found that the appellant, Charles Whitlatch, failed to prove that he was permanently and totally disabled. The ALJ found that appellant was entitled to only 50% wage-loss disability benefits beyond the 9% anatomical rating assigned by appellant's physician. On appeal, appellant claims that substantial evidence does not support the Commission's decision; we agree. Therefore, we reverse and hold that appellant is entitled to permanent total disability benefits.

In reviewing decisions from the Workers' Compensation Commission, the appellate court views the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's findings, and we affirm if the decision is supported by substantial evidence. Carman v. Haworth, Inc., 74 Ark. App. 55, 45 S.W.3d 408 (2001). Substantial evidence exists if reasonable minds could reach the same conclusion. Daniels v. Arkansas Dep't Human Servs., 77 Ark. App. 99, 72 S.W.3d 128 (2002); Lee v. Dr. Pepper Bottling Co., 74 Ark. App. 43, 47 S.W.3d 263 (2001). When a claim is denied because the claimant has failed to show an entitlement to compensation by a preponderance of the

evidence, the substantial-evidence standard of review requires us to affirm if the Commission's opinion displays a substantial basis for the denial of relief. *Clardy v. Medi-Homes LTC Serv. LLC*, 75 Ark. App. 156, 55 S.W.3d 791 (2001).

On February 2, 1998, appellant sustained a compensable injury to his low back when he was involved in a head-on motor vehicle accident while returning with supplies to his workplace, Southland Land & Development. At the time of appellant's injury, Southland Land & Development, the appellee, had employed appellant for seven years as a maintenance man. Appellant described his job duties as requiring him to refurbish mobile homes when a tenant moved, maintain the grounds, and perform minor plumbing and electrical jobs. Prior to working for appellee, Coker Building employed appellant in construction work, and International Paper employed him as a forklift driver. Appellant described all of his past work experience as manual labor.

In an effort to overcome his injuries and return himself to work, appellant underwent numerous procedures, tests, and treatments over a four-year period. Appellant initially came under the care of Dr. Richard McCarthy, with the Arkansas Spine Center. On April 22, 1998, Dr. McCarthy conducted an evaluation of appellant, and based upon the severity of appellant's injuries, the doctor reported:

> He has been in a good state of health until February 2, 1998, at which point he was involved in a motor vehicle accident. . . Mr. Whitlatch wound up underneath his steering wheel with the steering wheel up against his chest. Since then the pain has gotten worse. . . The pain is felt in his back and hip on the left. His leg pain is significantly worse than the back pain. The primary pain has been felt around the anterior aspect of his left hip into the left testicle along the medial side of his left thigh and has now settled at it's worst point pressed again the medial side of his left knee. There is some component of pain and numbness along the posterior aspect of the leg but this is much less than the thigh pain. There is some pain that extends along the medial side of the left calf as well. The pain is present throughout all of the day, and it is constant. He sleeps very poorly at night, often having to get up for pain relief. . . Walking or bending makes his pain worse. He really has a lot of difficulty even standing in one place. . . Although he desires going back to work, there is some question as to whether or not he will be able to go back to physical labor.

Dr. McCarthy performed surgery on appellant's back in June of 1998. Dr. McCarthy found the nerve root to be, "quite taut" and it appeared to be "under pressure from beneath." The postoperative diagnosis was, "herniated nucleus pulposus, L3-4, with extra tyramidal nerve root compression." The surgery relieved some of appellant's lower leg pain, but appellant's lower back, hip, and upper back pain remained. As a result of appellant's continuing pain, Dr. McCarthy ordered a follow-up MRI on August 27, 1998, which revealed significant scarring around the L3 nerve root. The report following the MRI states:

> No significant disc bulge or herniating is identified. Enhancing epidermal scar is identified in the left L3-4 foramen and extends back posteriorly and laterally from prior surgery. This may partially surround the L3 root within the foramen.

By September 9, 1998, appellant reported "intolerable" pain, and Dr. McCarthy referred appellant to Dr. Carl Covey for pain management. At that time, Dr. McCarthy wrote in his progress note:

> I will ask for him to be evaluated by the pain service and allow them to see what can be done for his problem. At this point he is unable to return to work, its too early to rate him and I would say that at this point he has a poor prognosis for being able to return to work. At this point, I don't have much else to offer him to be able to help him with his problem.

Dr. Covey implanted, first a trial and then a permanent, spinal cord stimulator to alleviate appellant's pain. Appellant testified that the stimulator made the pain bearable; however, it did not eliminate it. In addition, appellant was prescribed narcotic medication, OxyContin, twice daily and a Duragesic patch that he changes every forty-eight hours. In his medical reports, Dr. Covey indicated that the OxyContin was prescribed for appellant's "break through pain."

By December of 2000, appellant reported increasing pain, complaints of his legs falling asleep, and loss of bladder control. Dr. Covey wrote in a progress note on December 8, 2000:

> [Appellant] says that when he sits for a period of time or when he is sleeping many times at night, he legs will fall asleep so much that he can't get up or stand and loses control of his bladder at that time. It

is positional related. . . Assessment: patient with contractible back and left lower extremity pain, now with complaints of some numbness and incontinence, intermittent related to position, specifically sitting or laying for long periods of time. . .

Ultimately, appellant was referred for a functional capacity evaluation with Dr. Kevin Collins. On August 3, 2001, appellant underwent the testing, and the report confirmed that he was unable to complete many of the tests and exercises normally performed and that he was "crying" in pain while lifting only eight pounds. In spite of appellant's "crying" pain, the report concluded that appellant "displayed the functional abilities of working in the sedentary category for an eight-hour day. Frequent position changes should be afforded as needed."

Following the functional capacity evaluation, Dr. Collins issued a letter report dated September 19, 2001, and concluded that appellant was totally and permanently disabled, and unable to perform any work-related activities on a sustained basis. Dr. Collins specifically noted appellant's "good effort" during the course of the evaluation and diagnosed him with "failed back syndrome." Dr. Collins opined that appellant was totally and permanently disabled as a result of a combination of his "physical findings" and appellant's "narcotic usage." He also assigned appellant a 9% permanent impairment rating to the body as a whole.

On March 11, 2002, in a follow-up report, Dr. Collins wrote that appellant continued to suffer with severe pain in his left leg and low back. Appellant described his pain to Dr. Collins as "sharp and burning," as if he is on "fire," and as if "a piece of burning charcoal is inside his back." Appellant also reported to Dr. Collins that the leg and back pain were constant and that the narcotic medications only make the pain "bearable," at least to the point where he was not crying all of the time.

As a result of his severe pain, appellant is not able to sleep at night. During the day, he tries to lay down and rest. Due to his lack of sleep, he reports that he stays "irritable, jittery, and angry." According to appellant, he suffers side effects from the medications, which make him "feel groggy, down, and not there all the time." Appellant stated that he spends his days getting "up and down" to get comfortable. He testified that the most comfortable position for him is lying on his left side with his left leg pulled up towards his body with his right leg straightened. He said that

during the day he watches television, reads, and lies on his bed playing with his dog, a small toy fox terrier. Between the working hours of 8 a.m. and 5 p.m., he estimates that he spends four to five hours lying down and trying to cope with his pain. As a result of his pain, he is no longer able to take care of his household responsibilities, and a neighbor helps with his housework. He is unable to vacuum, cook, or wash dishes.

Before his compensable injury, appellant worked full time and reported that he liked his job. Now, however, as a result of his severe pain and the side effects he suffers from his medications, he does not believe that he would be able to concentrate or focus on a job. Appellant also suffers from memory loss associated with the medications. Yet, in an effort to address his ability to return to work, appellant underwent a vocational assessment on February 23, 2002, with Bob White, a vocational expert. White stated in his report:

> [Appellant] appears much older than his stated 44 years of age. He is very deconditioned, has wide circles under his eyes, and has a limp of the left leg. He stated that he had not slept in five days prior to this interview. He had to hold his left leg out in an extended position while sitting, leans forward in his chair propping himself up with his hands. He verbally expressed a need for help. . . I know of no unskilled jobs that offer the ability to alternately sit and stand. . . The effects of pain, medication, and depression and anxiety all can impact judgment, attention and concentration, persistence and pace which are required to complete the eight hour work day and the forty-hour work week. . . It is the opinion of this specialist that [appellant] is not a candidate for any type of employment and is unable to physically and mentally meet the demands of sedentary work. . .

At the time of the hearing, appellant was forty-four years old. Appellant completed the eleventh grade, but he had not obtained his GED. Appellant sustained an injury to a portion of his body that is not scheduled under workers' compensation laws. Therefore, appellant's entitlement to permanent disability benefits is controlled by Ark. Code Ann. § 11-9-522 (Repl. 2002), which states in pertinent part:

> (b)(1) In considering claims for permanent partial disability benefits in excess of the employee's percentage of permanent physical

impairment, the Workers' Compensation Commission may take into account, in addition to the percentage of permanent physical impairment, such factors as the employee's age, education, work experience, and other matters reasonably expected to affect his or her future earning capacity.

██ Pursuant to this statute, when a claimant has been assigned an anatomical impairment rating to the body as a whole, the Commission has the authority to increase the anatomical rating, and it can find a claimant totally and permanently disabled based upon wage-loss factors. *Cross v. Crawford County Memorial Hospital*, 54 Ark. App. 130, 923 S.W.2d 886 (1996). The wage-loss factor is the extent to which a compensable injury has affected the claimant's ability to earn a livelihood. *Emerson Electric v. Gaston*, 75 Ark. App. 232, 58 S.W.3d 848 (2001). The Commission is charged with the duty of determining disability based upon a consideration of medical evidence and other matters affecting wage loss, such as the claimant's age, education, and work experience. *Eckhardt v. Wills Shaw Express, Inc.*, 62 Ark. App. 224, 970 S.W.2d 316 (1998). In considering factors that may affect an employee's future earning capacity, the court considers the claimant's motivation to return to work, since a lack of interest or a negative attitude impedes our assessment of the claimant's loss of earning capacity. *Ellison v. Therma Tru*, 71 Ark. App. 410, 30 S.W.3d 769 (2000).

In spite of the opinions of Dr. McCarthy, Dr. Collins, and Bob White, the Commission concluded that appellant was not totally and permanently disabled, and found that he had only established by a preponderance of the evidence that "he sustained a decrease in his wage earning ability equal to 50% to the body as a whole, for a total permanent partial disability rating of 59% to the body as a whole." The Commission was persuaded by the fact that:

> [Appellant] is relatively young and has sustained a physical impairment rating of only 9% to the body as a whole. [Appellant] contends that his pain prevents him from returning to the work force, but he has not even attempted to seek any type of employment to determine the true extend of his wage loss disability.

The Commission also noted that appellant underwent a functional capacity evaluation, which determined that he "displayed the func-

tional abilities of working in the sedentary category for an eight-hour day. Frequent position changes should be afforded as needed."

Appellant argues that the Commission's analysis was flawed and that reasonable minds could not reach the decision that the Commission reached. Appellant's argument is well taken. Appellant maintains that he is totally and permanently disabled as the result of the combination of the severe pain he suffers from in his back and legs along with the severe side effects he suffers associated with the narcotic medication he takes daily.

■ In short, when taking into consideration appellant's limited education, manual-labor employment skills, severe pain in his back and legs, coupled with the side effects of necessary prescription pain medication, in addition to the testimony of his doctors and vocational expert, we are convinced that fair-minded persons with the same facts before them could not have reached the conclusion arrived at by the Commission, finding that appellant was anything less than permanently and totally disabled. *See Maxey v. Tyson Foods, Inc.,* 341 Ark. 306, 18 S.W.3d 328 (2000). For these reasons, we are compelled to reverse the Commission's decision.

BIRD and GRIFFEN, JJ., agree.