2009 Ark. App. 763

**SSI, INC. and Bituminous Insurance Company, Appellants,**

v.

**George W. CATES, Appellee.**

**No. CA 09–480.**

Court of Appeals of Arkansas.

Nov. 11, 2009.

Cross, Gunter Witherspoon & Galchus, P.C., by: R. Scott Zuerker, Fort Smith and Jimmy C. Cline, Little Rock, for appellants.

Walker, Shock & Harp, PLLC, by: J. Randolph Shock, Fort Smith, for appellee.

WAYMOND M. BROWN, Judge.

SSI, Inc. and its insurer, Bituminous Insurance Company, appeal from a decision of the Arkansas Workers' Compensation Commission awarding appellee George W. Cates additional medical benefits. Appellants contend that the Commission's determination that appellee is entitled to additional medical treatment is not supported by substantial evidence. We affirm.

Appellee was injured on August 8, 2005, while working for SSI, Inc. As a result of the accident, appellee suffered injuries to his head and cervical spine. The parties stipulated that appellee sustained a compensable injury, and appellants paid various medical expenses for treatment of appellee's injuries through November 9, 2007.

Appellee was initially treated at St. Mary's Regional Medical Center on the date of his injury. Dr. Russell Allison was the emergency-room physician. A cervical MRI was performed on appellee, which revealed extensive degenerative changes at multiple levels in appellee's cervical spine. The MRI also showed herniations of the intervertebral discs at C3–4, C4–5, and C5–6. The primary defect was indicated to be at the C5–6 level, where there was a large disc ridge complex and moderate stenosis. Appellee was assessed with central cord syndrome. In Dr. Allison's August 12, 2005 clinic note, appellee was assessed with cervical cord injury with bilateral hand hypersensitivity. Dr. Allison also indicated that appellee's MRI showed "inflammation in the cord distal to the impinged area, but surgical care is probably not reasonable." Dr. Allison referred appellee to Dr. Larry Armstrong.

Appellee presented to Dr. Armstrong on August 17, 2005. A physical exam by Dr. Armstrong revealed that appellee had "increased cervical spine spasm with tissue texture change, muscle spasm, ropiness, and tenderness noted especially over the right paraspinal region and the cervical region, as well as through the levator scapular trapezius regions bilaterally and supraspinatus region bilaterally." Dr. Armstrong reviewed appellee's MRI and diagnosed appellee with central cord syndrome and cervical spondylotic myelopathy. Dr. Armstrong opined that conservative treatment was appropriate and that surgery was not needed at that time.

Appellee was seen by Dr. Bradley M. Short on August 23, 2005. A physical examination of appellee's cervical spine revealed tenderness and muscle tightness but "no frank muscle spasms." Dr. Short diagnosed appellee with central cord syndrome, cervical spine stenosis, and neuropathic paresthesias and neuropathic pain. Dr. Short's medical note for August 29, 2005, indicated that appellee was experiencing muscle spasms and tightness in his neck area. The note also indicated that appellee had been referred for physical therapy. Dr. Short's note from October 18, 2005, showed that appellee had "sever-

al small trigger points and muscle tightness of his trapezius on the right and his right cervical paraspinal area." The November 15, 2005 note indicated that appellee's exam was "unchanged."

Appellee was seen by Dr. Armstrong on December 21, 2005. The clinic note for that date indicated that appellee had "actually made good clinical improvement until he was continuously leaning over the edge of a roof causing continuous headaches and arm numbness at times with neck pain." At the time of the visit, appellee was also having some sexual dysfunction. Appellee was referred to a neurologist and another MRI was ordered. Appellee's MRI was performed on December 28, 2005. The MRI revealed "multilevel spurring, disc protrusions, canal stenosis and foraminal stenosis from 3–4 through 6–7, with moderately severe canal stenosis at 5–6 and mild stenosis at 3–4, 4–5, and 6–7 with multilevel foraminal stenosis." Dr. Armstrong's clinic note for January 9, 2006, indicated that the December 28, 2005 MRI revealed no significant changes from the August 8, 2005 MRI. Dr. Armstrong opined that neurologically, appellee was doing about the same.

Appellee continued to be conservatively treated by Dr. Short. Dr. Armstrong wrote a letter to Dr. Short on February 6, 2006, indicating that appellee did not require anything ₄further from him (Dr. Armstrong) and also stressing the need for appellee to undergo a urologic evaluation before appellee performed his Functional Capacity Evaluation (FCE). Dr. Short's February 14, 2005 note indicated that appellee was having increased pain and spasms. Dr. Short opined that appellee's urology symptoms were probably not related to his spinal cord injury, but he

deferred that decision to a urologist.[1] The note also indicated that appellee was having some muscle spasms and tightness at the time of his visit. The note from March 7, 2006, indicated that appellee's exam was unchanged.

Appellee was seen by Dr. Michael W. Morse on February 17, 2006. Dr. Morse's impression provided:

This gentleman has a congenitally small canal and significant neural exit foraminal narrowing. He had an extension/flexion injury which has caused some neck and arm pain. He is not a surgical candidate from the standpoint of his workers' comp injury, but at some point in time, this will need to be addressed by a neurosurgeon for his congenital stenosis.

At the present time, all of his symptoms appear to be coming from his neck. He is in significant pain and has numbness especially when he drives or sleeps.

I recommend he see a pain specialist for epidural steroids to see if this will help him with his pain and numbness.

The disc protrusions were caused by the accident. The natural history of these is to improve. If they get worse and surgical intervention would be necessary because of the disc protrusion, that would be work-related. The spinal stenosis, however, is pre-existing. There is no evidence of myelopathy.

Appellee was seen by Dr. R. David Cannon on April 10, 2006. Appellee complained of neck pain and bilateral upper extremity pain. Dr. Cannon indicated that he would start appellee on epidural injections. Appellee presented to Dr. Short on May 23, 2006, with complaints of increased pain. Appellee informed Dr. Short that

---

1. Appellee was seen by a urologist and the tests performed revealed that appellee had low testosterone. Appellee received treatment for his low testosterone, but that was unrelated to his compensable injury.

the epidural steroid injections "really did nothing for him." The note indicated that appellee's exam was unchanged.

Appellee underwent a FCE on June 9, 2006. According to the exam, appellee gave an unreliable effort; however, appellee was determined to be able to perform work at least at the medium physical demand classification. On June 27, 2006, Dr. Short assessed a permanent physical impairment of five percent to the body as a whole and restricted appellee from engaging in any employment requiring occasional lifting in excess of fifty pounds, frequent lifting in excess of twenty-five pounds, or constant lifting in excess of ten pounds.

Appellee presented to Dr. Andrew Daniel on September 19, 2007, for re-evaluation of neck pain. The note also stated that appellee had settled his Worker's Comp injury and was doing well. According to the note, appellee "injured his neck doing some heavy lifting one month ago and is having a recurrence of his pain.... He did not fall and have a notable injury. He was simply involved with his normal activities at work. He works in construction and had gradual onset of his symptoms." Appellee was diagnosed with chronic neck pain secondary to cervical spondylosis with acute exacerbation. Appellee underwent another MRI on October 2, 2007. That MRI revealed basically the same defects as prior studies.

Appellee was seen by Dr. Anthony L. Capocelli on November 7, 2007, for consultation regarding cervical spondylosis. Dr. Capocelli's note stated the following:

> At this point I would recommend CT myelography to better elucidate nerve impingement and canal impingement from these problems and also get a better idea of spurring versus disc. Then at that point we might also consider discography to better localize the potential origins of the symptomatology.

Certainly, if we can identify cervical lesion then he may be at a point in his convalescence that surgery may be indicated. Certainly, if we cannot localize it, then just ongoing nonoperative interventions would be recommended. To the best that I can tell, the patient has reported to me that he has had problems in the past, but has really never had any major neck symptomatology until this accident at work insomuch as the history is valuable to us. It appears to me that this primary injury is related and at least the primary pain and symptoms that he is currently having are related to his work injury.

At some point, appellee began treating with Dr. Terry Brackman for pain management.

A hearing concerning appellee's need for additional medical treatment took place on May 27, 2008. At the hearing, appellants introduced an April 24, 2008 letter from Dr. Short stating "it is apparent the [appellee's] primary abnormality is congenitally small spinal canal, and that any surgical intervention considered would be to correct the congenital abnormality. It is my opinion that the work injury did not cause greater than 50% of [appellee's] abnormalities." Appellants also presented a letter from Dr. Morse dated April 24, 2008. In that letter, Dr. Morse also opined that appellee's "surgical needs are only related to his congenitally small spinal canal and not his reported work injury." The ALJ issued its opinion on July 29, 2008, granting appellee additional medical treatment. In that opinion, the ALJ stated:

> After consideration of all the evidence presented, it is my opinion that the claimant has proven that the medical services recommended by Dr. Capocelli, in the form of a cervical myelogram with an accompanying enhanced CT scan and potentially a discography, are

necessitated by or related to his compensable injury of August 8, 2005. Clearly, these recommended tests are, in Dr. Capocelli's opinion, medically appropriate and reasonably necessary to accurately diagnose the nature and extent to the claimant's compensable injury and to formulate an appropriate treatment program. The clear purpose of these tests are to allow a determination, with reasonable accuracy, the cause of the claimant's persistent symptoms that first appeared after his compensable injury, both objective and subjective.

It must be noted that Dr. Capocelli is a board-certified neurosurgeon with considerable expertise in the area of medicine associated with the diagnosis and treatment of injuries and defects such as those experienced by the claimant. Clearly, he would not recommend testing that did not have a reasonable expectation of accomplishing this intended purpose. This additional testing is commonly recognized in the general medical community as the "gold standard" in accurately determining the nature or etiology of cervical complaints.

Thus, the claimant has satisfied the two necessary elements for this recommended testing to constitute "reasonably necessary medical services" under Ark.Code Ann. § 11–9–508. Pursuant to the provisions of this subsection, the respondents are liable for the expense of these services (subject to the Commission's medical fee schedule).

. . . . .

Finally, I find that the greater weight of the credible evidence establishes that the medical services provided to the claimant by and at the direction of Dr. Terry Brackman, solely for his cervical difficulties, was and is also necessitated by or related to the claimant's compensable cervical injury of August 8, 2005.

Further, such medical services provided through January 29, 2008, have been shown to have a reasonable expectation of accomplishing their intended purpose of managing the claimant's chronic symptoms (particularly pain and muscle spasms) resulting from his compensable cervical injury.

Thus, these medical services would also represent reasonably necessary medical services under Ark.Code Ann. § 11–9–508. Further, pursuant to the provisions of this subsection, the respondents will be liable for the expenses of these services. Again, this liability would be subject to the Commission's medical fee schedule. .

▮ Appellants appealed to the Commission. The Commission adopted and affirmed the decision of the ALJ. Under Arkansas law, the Commission is permitted to adopt the ALJ's decision. *See Odom v. Tosco Corp.*, 12 Ark.App. 196, 672 S.W.2d 915 (1984). Moreover, in so doing, the Commission makes the ALJ's findings and conclusions the findings and conclusions of the Commission. *See ITT/Higbie Mfg. v. Gilliam*, 34 Ark.App. 154, 807 S.W.2d 44 (1991). Therefore, for purposes of our review, we consider both the ALJ's order and the Commission's majority order.

▮ In reviewing decisions from the Workers' Compensation Commission, we view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's findings, and we affirm if the decision is supported by substantial evidence. *See Whitlatch v. Southland Land & Dev.*, 84 Ark. App. 399, 141 S.W.3d 916 (2004). Substantial evidence exists if reasonable minds could reach the Commission's conclusion. *Id.* Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Williams v. Pros-*

*taff Temporaries,* 336 Ark. 510, 988 S.W.2d 1 (1999). There may be substantial evidence to support the Commission's decision even though we might have reached a different conclusion if we had sat as the trier of fact or heard the case de novo. *Freeman v. Con-Agra Frozen Foods,* 344 Ark. 296, 40 S.W.3d 760 (2001).

■ The Commission has the duty of weighing medical evidence as it does any other evidence, and the resolution of conflicting evidence is a question of fact for the Commission. *Public Employee Claims Div. v. Tiner,* 37 Ark.App. 23, 822 S.W.2d 400 (1992). The interpretation given to medical evidence by the Commission has the weight and force of a jury verdict, and this court is powerless to reverse the Commission's decision regarding which medical evidence it chooses to accept when that evidence is conflicting. *Hill v. Baptist Med. Ctr.,* 74 Ark.App. 250, 57 S.W.3d 735 (2001). However, the Commission may not arbitrarily disregard medical evidence or the testimony of any witness. *Id.*

■ Employers are required to promptly provide for injured employees such medical services and medicine as may be reasonably necessary in connection with the injury received by the employee. *See* Ark.Code Ann. § 11–9–508(a) (Supp.2007). What constitutes reasonable and necessary treatment of an injured employee for workers' compensation purposes is a question of fact for the Commission. *Gansky v. Hi-Tech Engineering,* 325 Ark. 163, 924 S.W.2d 790 (1996). A claimant may be entitled to ongoing medical treatment after the healing period has ended, if the medical treatment is geared toward management of the claimant's injury. *Patchell v.*

*Wal-Mart Stores, Inc.,* 86 Ark.App. 230, 184 S.W.3d 31 (2004).

■ Appellants assert that "three physicians, Dr. Armstrong, Dr. Morse, and Dr. Short, all 'unequivocally opined' that any cervical surgical intervention needed would be to correct [appellee's] congenital condition." According to appellants, the Commission arbitrarily disregarded the medical evidence of the doctors above and "instead chose to rely solely upon Dr. Capocellis' [sic] report. Dr. Capocelli's progress note, however, is simply unreliable, as Dr. Capocelli clearly failed to include as part of his evaluation Appellee's entire medical history."

In the present case, the Commission was confronted with opposing medical opinions, and it chose to accept Dr. Capocelli's. It is well settled that it is the province of the Commission to weigh conflicting medical evidence, and the resolution of conflicting evidence is a question of fact for the Commission. *Southeast Ark. Human Dev. Ctr. v. Courtney,* 99 Ark.App. 87, 257 S.W.3d 554 (2007). The Commission discussed all of the doctors' opinions, so no evidence was arbitrarily disregarded. Deferring to the Commission on the weight to be given the evidence, as we must, we find that there is substantial evidence to support the Commission's award of additional medical treatment.

Affirmed.

GRUBER and BAKER, JJ., agree.