SLIP OPINION


# ARKANSAS COURT OF APPEALS
DIVISION I
No. CV–17–225

CHERI STOKER

APPELLANT

V.

THOMAS RANDAL FOWLER, INC.,
AND PROTECTIVE INSURANCE
COMPANY/BALDWIN AND LYONS,
INC.

APPELLEES

OPINION DELIVERED: NOVEMBER 8, 2017

APPEAL FROM THE ARKANSAS
WORKERS' COMPENSATION
COMMISSION
[NO. G409736]

AFFIRMED

## ROBERT J. GLADWIN, Judge

The Arkansas Workers' Compensation Commission (Commission) denied appellant Cheri Stoker's claim for additional medical testing and treatment, finding that they were not reasonably necessary for the compensable medical injuries Stoker sustained on December 5, 2014. In making its decision, the Commission relied on Dr. Steven Cathey's report of the independent medical examination (IME) he performed. Stoker contends on appeal that the IME should not have been admitted into evidence and that the Commission erred by relying on it. We affirm.

### I. *Facts*

Stoker worked as a driver and trainer for appellee Thomas Randal Fowler, Inc., a trucking company in Texarkana, Arkansas, when she sustained compensable injuries to her neck, back, and right knee on December 5, 2014. Her injuries were the result of her truck being hit from behind after she had unbuckled her seat belt in preparation for delivering a package. Stoker was treated over the course of a year, received an IME, and was seen by

Dr. Pierce Nunley after the Commission granted her change-of-physician request. When Dr. Nunley recommended additional testing and treatment on December 17, 2015, appellee controverted Stoker's claim.

At the June 2, 2016 hearing before the administrative law judge (ALJ), Stoker's counsel objected to the admission of the IME report prepared by Dr. Cathey. Counsel argued that Stoker had not been informed that Dr. Cathey was to perform an IME and that Stoker went to the appointment under the assumption that she would be medically treated. Counsel argued that Dr. Cathey's report should be excluded because Stoker did not give proper or informed consent. Counsel further argued that Stoker was not provided through discovery the introductory letter mentioned in Dr. Cathey's report. At the close of the hearing, the ALJ posed more questions concerning the IME, including whether appellee's counsel had seen the introductory letter mentioned in Dr. Cathey's report. Counsel stated that he had tried to obtain the letter but that his "adjusters had changed up," and he had never received it. Stoker's counsel also stated that had he been given notice, he would have objected to his client's seeing Dr. Cathey. The ALJ took under advisement the issue of the report's admissibility. The ALJ also noted for the record that Respondent's exhibit 2 was a surveillance video of Stoker that he would view following the hearing.[1]

Stoker testified about the circumstances of the automobile accident that resulted in her compensable injuries on December 5, 2014. She said that she had not been having any neck problems before the accident; but since the accident, she could not turn her head

---

[1]Stoker failed to include a copy of the surveillance video in the addendum, in violation of Ark. Sup. Ct. R. 4-2(a)(8)(A)(i) (2016). Because the DVD is not essential to Stoker's argument regarding admission of the IME, we do not require rebriefing.

"right all the way to turn to look back" when driving. She also said that she gets "really bad headaches" three to four times a week and that she had to "sleep kind of cock-eyed" at night. She said that since the wreck, she had muscle spasms down her arms and legs, in the front of her legs, and in her back and neck. She complained that she did not "have a grip" in her left hand.

Stoker said that after she went to the emergency room following the wreck, she was sent to a company doctor for follow-up care—HealthCare Express (HCE). She was prescribed medication and given some restrictions for work, but no light-duty work was available. She said that HCE prescribed physical therapy along with medication, and an MRI was ordered, after which HCE "wanted [her] to see a neurosurgeon." She said, however, that she was sent to an orthopedist, Dr. Dwayne Daniels.

Stoker said that Dr. Daniels ordered a nerve-conduction study and that he also talked about "some injections." She testified that Dr. Daniels's progress note was incorrect in stating that she had previously had an MRI of her neck and back, and she stated that the MRI was done only on her neck. She stated that Dr. Daniels recommended that she see a neurosurgeon for her neck and that he had recommended many times that she receive epidural steroid injections. She said that she had never received any injections in her neck and claimed that as she received therapy and used the TENS unit, her symptoms where somewhat relieved but were not totally resolved. In spite of the therapy and the TENS unit, she said that she still had continuing headaches, pain, and spasms and was unable to use her left arm and hand. She explained that when she tried to use her left arm or hand, she dropped anything over ten pounds and her hand shook and spasmed.

Stoker testified that after the functional capacity evaluation (FCE), she followed up with Dr. Daniels, and he "thought [she] still needed to see a neurosurgeon and to continue with additional therapy." She said that there was an appointment scheduled with Dr. Cathey, and she believed that she would receive from him the epidural steroid injections that Dr. Daniels had suggested. She received a letter from Dr. Cathey "on Friday to be there on Monday morning at 8:00." Along with the letter was a form for her to fill out that asked for her height, weight, address, and the like. When she arrived at Dr. Cathey's office, she was not told she was there for any reason other than for medical treatment. She said that Dr. Cathey examined her for eight to ten minutes, that his hand "was shaking just as bad as mine was," and that he touched her left hand and put his hand on the back of her neck for a second. She said that he then showed her the MRI of her neck and talked about it. He told her that he was not recommending any treatment. She said that she had understood that the FCE gave her a ten-pound weight limit and no lifting above her head—sedentary restrictions. She testified that when she was discharged by Dr. Cathey, she was given no restrictions or limitations and was told that she could return to full-duty work. She said that she did not agree with that. She also said that she signed papers on her way out of Dr. Cathey's office, but she did not read them first. She said that she had not been aware at that time that Dr. Cathey had performed an IME.

She said that she understood she was to return to Dr. Daniels after seeing Dr. Cathey. While she was driving to Dr. Daniels's office, his nurse called and canceled her appointment. She said that even though her physical therapy had not been completed, Dr. Daniels had placed her at maximum medical improvement (MMI). She said that she continued to

receive physical therapy after Dr. Cathey's appointment and that she completed that therapy. However, she claimed that when she tried to go back to work, she failed the company physical.

Stoker said that after she learned that Dr. Daniels had placed her at MMI, she obtained a change of physician and saw Dr. Nunley one time. She said that he examined her and that she was there about forty-five minutes. She said that he performed tests and took measurements. She stated that he recommended a selective nerve-root injection at C6-7 for palliative and diagnostic value. He also wanted an MRI of her lumbar spine, more physical therapy, and a trial of cervical and lumbar traction. She had not received any of the recommended treatment and has been seen only in the emergency room for medical care since seeing Dr. Nunley.

On cross-examination, Stoker said that when the December 5, 2014 accident occurred, she had an open workers'-compensation claim pending on her left knee, and that claim was settled in September 2015. She said that she has full use of both knees. She also said that she has a third-party lawsuit against the man who was driving the vehicle that hit her truck but denied that her third-party claim would benefit if she did "not get better." She said that she wanted to get better and get back to work. She admitted that Dr. Nunley had been mistaken in his report that she had a hip injury and that she had not had any CTs or EMGs.

In an opinion filed July 19, 2016, the ALJ held that Dr. Cathey's IME report was admissible. The ALJ relied on *Bryant v. Staffmark, Inc.*, 76 Ark. App. 64, 61 S.W.3d 856 (2001), which held that the Commission is given a great deal of latitude in evidentiary

matters and is not bound by technical or formal rules of procedure. The ALJ reasoned that both HCE and Dr. Daniels had requested that Stoker be evaluated by a neurosurgeon and that Dr. Cathey is a neurosurgeon. The ALJ found no evidence, authority, or rationale as to why Dr. Cathey's letter discussing his evaluation and conclusions should not be admissible. The ALJ then found Dr. Cathey's opinion that Stoker had reached MMI and was no longer in need of additional medical treatment to be credible. The ALJ accorded more weight to Dr. Cathey's opinion than to Dr. Nunley's opinion because Dr. Cathey's opinion was consistent with Dr. Daniels's opinion that Stoker had reached MMI. The ALJ also relied on the surveillance video of Stoker returning from grocery shopping on January 20, 2016, and carrying four sacks of groceries in her left hand, which was inconsistent with her testimony that she had lost the grip in her left hand. On January 27, 2017, the Commission affirmed and adopted the decision of the ALJ, and this appeal timely followed.

II. *Standard of Review*

Under Arkansas law, the Commission is permitted to adopt the ALJ's opinion. *SSI, Inc. v. Cates*, 2009 Ark. App. 763, 350 S.W.3d 421. In so doing, the Commission makes the ALJ's findings and conclusions the findings and conclusions of the Commission. *Id.* Therefore, for purposes of our review, we consider both the ALJ's opinion and the Commission's majority opinion. *Id.*

> When reviewing a decision of the Commission, we view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the findings of the Commission and affirm that decision if it is supported by substantial evidence. *Parker v. Atl. Research Corp.*, 87 Ark. App. 145, 151, 189 S.W.3d 449, 452 (2004). Substantial evidence is that relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.*, 189 S.W.3d at 453. The issue is not whether this court might have reached a different result from the Commission; the Commission's decision should not be reversed unless fair-minded persons could not

have reached the same conclusions if presented with the same facts. *Id.*, 189 S.W.3d at 453. When a claim is denied because a claimant failed to show entitlement to compensation by a preponderance of the evidence, the substantial-evidence standard of review requires that we affirm if a substantial basis for the denial of relief is displayed by the Commission's opinion. *Id.*, 189 S.W.3d at 453.

The Commission determines credibility, weighs the evidence, and resolves conflicts in medical testimony and evidence. *Godwin v. Garland Cty. Landfill*, 2016 Ark. App. 498, at 4, 504 S.W.3d 660, 662. The Commission is not required to believe the testimony of any witness but may accept and translate into findings of fact only those portions of the testimony it deems worthy of belief. *Sandeford v. United Parcel Serv., Inc.*, 2014 Ark. App. 228, at 2. It is not the role of the appellate court to weigh the evidence and judge the credibility of the witnesses. *Id.*

*Johnson v. PAM Transport, Inc.*, 2017 Ark. App. 514, at 5–6, ___ S.W.3d ___, ___.

### III. *Evidentiary Ruling*

Stoker's first argument is related to the Commission's evidentiary ruling, which we consider under the following standards:

The Workers' Compensation Commission has broad discretion with reference to admission of evidence, and its decision will not be reversed absent a showing of abuse of discretion. *Brown v. Alabama Elec. Co.*, 60 Ark. App. 138, 959 S.W.2d 753 (1998). The Commission is given a great deal of latitude in evidentiary matters; specifically, Arkansas Code Annotated section 11-9-705(a) (Repl. 1997) states that the Commission "shall not be bound by technical or statutory rules of evidence or by technical or formal rules of procedure." Additionally, the Commission is directed to "conduct the hearing in a manner as will best ascertain the rights of the parties." Ark. Code Ann. § 11-9-705(a); *Clark v. Peabody Testing Service*, 265 Ark. 489, 579 S.W.2d 360 (1979).

. . . .

In our view, it is clear that the Commission should be more liberal with the admission of evidence, rather than more stringent.

*Coleman v. Pro Transp., Inc.*, 97 Ark. App. 338, 344–45, 249 S.W.3d 149, 154 (2007) (citing *Bryant*, 76 Ark. App. at 69, 61 S.W.3d at 859); *see also Clement v. Johnson's Warehouse Showroom, Inc.*, 2012 Ark. App. 17, 388 S.W.3d 469.

Stoker contends that the IME should not have been admitted into evidence and that the Commission erred in relying on the IME in denying her claim. She claims that the key issue is whether it is proper for the insurance company to schedule an IME but not tell the claimant or the claimant's lawyer that it is an IME and not an appointment for follow-up treatment as recommended by the then existing treating physician.

Stoker cites the statutory provision stating that an injured employee may be required to submit to a physical examination and treatment by another qualified doctor, designated or approved by the Commission. Ark. Code Ann. § 11-9-511(a) (Repl. 2012). She also points to Commission Rule 099.30, which defines an IME as an examination and evaluation conducted by a practitioner different from the practitioner providing care. *See* Ark. Admin. Code 099-00.1–099.30(I)(H)(1)–(3) (WL current through Sept. 2017). The Rule further provides what should be included in an IME and how it should be billed. *Id.* Stoker argues, therefore, that an IME is not designed to treat but to generate proof to support either the claimant or the respondent. Stoker also references standards published by the American Medical Association for an IME and argues that Dr. Cathey did not comply with those standards.

Stoker relies on her own testimony regarding her belief that she was going to see Dr. Cathey for epidural steroid injections, the description she gave of the examination performed by Dr. Cathey, and the explanation she gave about the cancelation of her last appointment with Dr. Daniels. She sets forth the ALJ's questions to her counsel regarding whether he would have agreed to allow Stoker to see Dr. Cathey had she been given notice of the IME. She contends,

In other words, but for the 'trickery' of the insurance company it is likely Dr. Cathey would have never had the opportunity to declare Ms. Stoker at MMI based, essentially, on exactly the same medical information that Dr. Daniels had available when he referred her for injections—injections she never received.

Stoker complains that the letter from the adjuster arranging the appointment with Dr. Cathey is absent from the record and has never been disclosed to her. She argues that the ALJ should have applied a negative inference to appellee's failure to produce the introductory letter sent to Dr. Cathey and should have refused to allow his report to be admitted as evidence unless the letter was submitted.

Appellee contends that the admission of Dr. Cathey's report was proper and within the Commission's authority as a finder of fact. We agree. It was not an abuse of discretion to admit the report, and Stoker offers no authority or convincing argument to the contrary. Because the Commission is not bound by technical or statutory rules of evidence or by technical or formal rules of procedure, the Commission is empowered to allow whatever evidence it sees fit into the record. Ark. Code Ann. § 11-9-705(a)(1). Stoker's conclusion—had she known that Dr. Cathey was going to perform an IME, she would have refused to participate—is not a basis upon which this court can reverse the Commission. Appellee points out that the Commission could have given Dr. Cathey's report little or no weight had it seen fit. The Commission examined the available medical evidence and testimony and found Dr. Cathey's report to be convincing because it more closely resembled the reports by Dr. Daniels. Accordingly, we affirm the decision to admit the IME.

IV. *Additional Medical Treatment*

Stoker argues that with the addition of Dr. Cathey's report, the ALJ had four differing medical opinions. She argues that Dr. Daniels thought Stoker needed further treatment

until Dr. Cathey became involved. Dr. Nunley suggested injections, further diagnostic testing, physical therapy, and cervical and lumbar traction. The company doctor who gave Stoker a physical to determine her fitness for work did not pass her. Therefore, the only doctor who gave up on further treatment was Dr. Cathey, described by Stoker as a "hired gun."

Stoker argues that the Commission should be concerned about regulation of the IME process in Arkansas. She argues that there is too much reliance on an IME and that "Respondents across the state have their 'favorite' physicians, as do Claimants, of course." She contends that the Commission should have used her case to establish a precedent that no claimant can be referred for an IME unless (1) the claimant is told that the examination will be an IME and the purpose of an IME is explained to the claimant, and (2) the claimant is given a reasonable time to object to the physician chosen by the respondent. She urges this court to adopt these guidelines.

She argues that the Commission arbitrarily disregarded the medical evidence of her failing the medical exam for returning to work and Dr. Nunley's detailed findings and report. Further, she claims that Dr. Cathey's opinion should be ruled to be inadmissible and that, at the very least, it should be given the least weight of all the opinions. She relies on Commissioner Hood's dissent, wherein he opined that Dr. Cathey's opinion should be given little weight because it was designed to save the employer money and Dr. Nunley had given Stoker a more thorough examination.

We hold that the Commission did not arbitrarily disregard evidence. The ALJ's opinion stated,

In the present case, I find credible the opinion of Dr. Cathey indicating that by July 27, 2015, Ms. Stoker had reached maximum medical improvement and did not need any additional medical treatment including but not limited to physical therapy and injections. I accord more weight to Dr. Cathey's opinion on these matters than the weight I accord Dr. Nunley's opinion regarding the need for additional testing and treatment. I conclude that Dr. Cathey's opinion is consistent with Dr. Daniels' opinion shortly thereafter that Ms. Stoker had reached maximum medical improvement.

In reaching this conclusion, I am also relying significantly on surveillance video of Ms. Stoker returning from grocery shopping on the evening of January 20, 2016. Although Ms. Stoker testified at the hearing that she has lost the grip of her left hand, this examiner counted four sacks of groceries that Ms. Stoker picked up out of the trunk one at a time with her right hand. She immediately transferred each of the four sacks into her left hand, so that when she walked from the car to the door at 5:03 p.m., she carried four bags of groceries in her left hand and only one bag of groceries in her right hand. I did not find this activity consistent with her hearing testimony that she has lost the grip in her left hand.

Dr. Nunley's opinion was not disregarded, it was just not given as much weight as Dr. Cathey's opinion. The Commission has the duty to resolve conflicting medical evidence, including medical testimony. *Johnson*, *supra.* Further, the Commission's reliance on the video surveillance of Stoker carrying grocery sacks in her left hand shows that the choice of Dr. Cathey's opinion over that of Dr. Nunley was also based on the record as a whole and on a determination of Stoker's credibility.

Having determined that the Commission committed no error in admitting Dr. Cathey's IME report, the report, coupled with the Commission's determination on Stoker's credibility, constitutes substantial evidence to support the Commission's decision to deny additional medical treatment and testing.

Affirmed.
ABRAMSON and WHITEAKER, JJ., agree.

*Moore, Giles & Matteson, L.L.P.*, by: *Greg Giles*, for appellant.
*Jason M. Ryburn*, for appellees.