Cite as 2019 Ark. App. 372

# ARKANSAS COURT OF APPEALS

DIVISION III

No. CV-19-130

| | |
|---|---|
| ARKANSAS DEPARTMENT OF TRANSPORTATION AND ARKANSAS INSURANCE DEPARTMENT, PUBLIC EMPLOYEE CLAIMS DIVISION<br>APPELLANTS | Opinion Delivered: September 11, 2019<br><br>APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION [NO. G500556] |
| V. | |
| JOHN ABERCROMBIE AND DEATH AND PERMANENT TOTAL DISABILITY TRUST FUND<br>APPELLEES | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellants, Arkansas Department of Transportation (ADT) and Arkansas Insurance Department, Public Employee Claims Division (PECD), appeal from a December 17, 2018 opinion by the Arkansas Workers' Compensation Commission (Commission) affirming and adopting the findings of fact and conclusions of law made by the administrative law judge (ALJ) in favor of appellee, John Abercrombie. The Commission found that Abercrombie was entitled to a 50 percent wage-loss disability benefit. On appeal, ADT and PECD (collectively appellants) contend that substantial evidence does not support the Commission's finding that Abercrombie proved his entitlement to 50 percent wage-loss disability benefit. We affirm.

## I. *Relevant Facts*

Many of the facts are undisputed. Abercrombie was sixty-two years old at the time of the hearing before the ALJ. He obtained his graduate equivalency degree while he was in the United States Army. After his honorable discharge, he worked as a truck driver and also at a dairy. In 1986, he obtained an associate's degree in computer programming and began his employment at ADT following his graduation in the computer and information-technology section. He assisted in the user-support group, wrote computer code, and maintained equipment utilized by ADT. Although Abercrombie had sustained previous work-related injuries and had other surgeries during his lifetime, he had no work restrictions when he sustained the compensable injury at issue. It is undisputed that Abercrombie sustained the compensable back injury at issue on December 5, 2014, while moving a printer during his employment at ADT.

After the injury, Abercrombie had pain in his back and left leg and had difficulty ambulating. He underwent surgery on January 26, 2015, by Dr. Anthony Capocelli, which included decompressive laminectomy with pedicle screw instrumentation and lumbar TLIF. However, after Abercrombie's back symptoms did not resolve, Dr. Capocelli operated again on May 5, 2016, performing an anterior lumbar fusion. Unfortunately, Abercrombie suffered a complication from the surgery that caused an abdominal hematoma, necessitating yet another surgery. Because physical therapy did not help, Abercrombie was also referred to Dr. Carlos Roman for pain management. In addition to a TENS unit and pain medication, Abercrombie has received several epidural steroid injections under Dr. Roman's care.

2

On February 10, 2017, a functional capacity evaluation was conducted, and Abercrombie demonstrated the ability to perform work in the "LIGHT classification of work as defined by the US Dept. of Labor's guidelines." Abercrombie reached maximum medical improvement as of February 21, 2017, and was assigned an impairment rating of 19 percent to the body as a whole. He was further released to work on March 28, 2017, with the following work restrictions: light duty capacity with frequent position changes; no more than ten pounds lifting frequently and twenty pounds occasionally; no squatting, climbing, working on vibrating platforms, or working at heights; and avoid dust and fumes.

Thereafter, Abercrombie first reported back to work one morning in early April 2017 at approximately 7:00 a.m. However, according to Abercrombie's testimony before the ALJ, ADT did not appear to be ready for his return. Someone else was occupying Abercrombie's desk, but ADT was eventually able to locate a variable-height desk that would allow him to work while either sitting or standing. His newly assigned desk was located near a pile of outmoded equipment, and he testified that he was afraid to move any equipment because he did not want to reinjure himself. ADT did not have a computer for him to use, as his old one was missing, and Abercrombie spent some of his time that morning trying to find a comfortable chair. Although he was not provided with a suitable computer that morning, he acknowledged that personnel were attempting to locate one for him. Abercrombie additionally explained that he spent the first hour and forty-five minutes of his work making coffee, visiting with colleagues, and attempting to find a comfortable chair.

He further testified that with his medication, he was "foggy and dumbfounded." When a highway police officer brought him a technological issue, he was unsure how to

3

help him because he had been absent from the job for two years, and technology had advanced during the interim. Moreover, Abercrombie testified that he was "just in a fog" and that his pain symptoms "went from bad to worse." He stated that his pain level was a five or six out of ten when he arrived at work but that it was nearly an eight out of ten by 9:00 a.m. Therefore, Abercrombie stated that because of the spasms, pain, and medication, he could not continue working and that he needed to go home. He explained that at that time, he was ready and willing to work and that although he thought he was able to work, he discovered that he was "not capable of working." Thus, based on his conclusion that he was unable to work, he decided to leave the Deferred Retirement Option Plan (DROP) program early and file his retirement paperwork with ADT just a few hours after reporting to work in April 2017. Abercrombie had entered the DROP program in July 2014, and he stated that it had been his intention to retire five years thereafter.

Pamela Abercrombie, John Abercrombie's wife, echoed her husband's testimony that he had spasms, could not walk very far, had difficulty concentrating and with his memory, and needed to change positions frequently. She further testified that she did not think her husband was physically capable of working given his condition, and she expressed her concern about his driving while taking his medications.

Bryan Stewart, the division head of computer services at ADT and Abercrombie's supervisor, testified that he also considered Abercrombie to be a friend. Stewart testified that ADT had attempted to accommodate Abercrombie to aid in his return to work. However, Stewart stated that he was surprised that Abercrombie decided to retire so quickly and thought Abercrombie would have worked at least two or three days before retiring.

4

Stewart further testified that he did not think Abercrombie really made an attempt to work and that the technological issue brought to him by the highway police officer was something that he would have expected Abercrombie to have been able to resolve. That said, Stewart corroborated Abercrombie's testimony that Abercrombie was "in extreme pain at that time." Additionally, Stewart stated that Abercrombie had expressed concern to him about his taking medication and its effect on his ability to drive.

After Abercrombie retired from ADT, he continued his treatment with Dr. Roman. He also saw Heather Taylor, a vocational consultant, hired by appellants. In Taylor's July 31, 2017 report, she offered the following recommendations:

> Mr. Abercrombie has a skilled work history that has afforded him the opportunity to acquire several skills. He has been released to return to the workforce and has been given Light category restrictions per his FCE. His job at the time of injury was classified in a Sedentary/Light category and he has a skill set that will allow him to return to the same or similar field that would be consistent with his FCE. He made the decision to retire in April 2017, even though it appears that the highway department would have provided him with some job accommodations. We discussed his interest in returning to work in the future. He was unsure of his physical capability to do so, but said that he would be interested in seeing what other job options might be available in his area and then make a decision about whether to begin the actual job application/job search process. If approved, I could complete a job market survey in an effort to identify openings that provide such information to him for review and consideration.

Abercrombie testified that Taylor never followed up with him regarding any job openings, despite her statement in her report that she would do so. He additionally testified that he would have pursued any leads that she would have provided. He also clarified upon further questioning by the ALJ that he was still ready and willing, but not able, to go back to work. However, he explained that if a prospective employer could accommodate his need to alternate sitting, standing, walking, and lying down, he would try to work.

On August 28, 2017, Dr. Capocelli filled out a questionnaire regarding Abercrombie's ability to do work-related activities. Dr. Capocelli opined based on a reasonable degree of medical certainty that Abercrombie would need a fifteen-minute break every two to three hours in addition to two ten-to-fifteen-minute breaks during an eight-hour shift and thirty minutes to an hour for lunch. Dr. Capocelli additionally anticipated that Abercrombie would be absent about once a month due to his impairment or treatment.

Abercrombie testified that after Taylor did not provide him with any leads, he looked for jobs using the newspaper classified advertisements and hired Tanya Rutherford Owen, another vocational consultant, to help him try to identify potential jobs. Although Owen provided him with some potential job opportunities, Abercrombie was not offered any of the jobs or even an interview after applying. In her March 14, 2018 report, Owen explained the following:

> While Mr. Abercrombie has skills in an industry that is in high demand, he has other vocationally-relevant factors that need to be considered in assessing Mr. Abercrombie's employability. These include his age, his need for disability-related accommodations and his 3-year absence from the labor market.
>
> . . . .
>
> Mr. John Abercrombie is a 62-year-old male with an Associate of Applied Science in Computer Programming, which he earned in 1986. He has been employed by the Arkansas Highway Department for 30+ years as a network support engineer. During this reporting period, Mr. Abercrombie's resume has been reviewed and revised, he has been provided information about job seeking skills and 36 potential job leads were developed. While not all of the job openings located were within his skill or exertional capabilities, he applied for 15 jobs and has received notification from six employers that he met the minimum qualifications for the job. The factors outlined above should, in my opinion, be considered when making a determination about his employability.

At the hearing before the ALJ, appellants stated that they accepted that appellee was entitled to an impairment rating of 19 percent to the body as a whole; however, they controverted Abercrombie's claim that he was permanently and totally disabled or, in the alternative, entitled to wage-loss disability benefits. The ALJ filed his opinion on June 25, 2018, and made the following relevant findings:

> The evidence shows that Claimant is (presently) 63 years old. In addition to a graduate equivalency degree, he obtained an honorable discharge from the U.S. Army. After working in a dairy and as a truck driver, Claimant returned to school and obtained an associate's degree in computer programming. With that degree, he went to work for Respondent AHTD, where he remained for the rest of his career. There, he continued to work in IT and advanced. As of December 2014, his annual salary was approximately $69,250.00, and his duties included handling the technological issues of the Arkansas Highway Police.

> Prior to his stipulated compensable injury, Claimant underwent two neck surgeries. He also had back, left knee and left shoulder procedures. The neck condition, was work-related, as was the shoulder and back. But in each instance, he was released to return to work at full duty-and the evidence shows that he was able to go back to work as before. His surgical treatment for carpal tunnel syndrome was also successful.

> As the parties have stipulated, Claimant suffered a compensable injury to his back on December 5, 2014. This occurred when he picked up a printer off of the floor at work and then twisted. He first underwent surgery for the injury on January 26, 2015. Dr. Capocelli performed a decompressive laminectomy with pedicle screw instrumentation and a lumbar transforaminal lumbar interbody fusion at L4-5. However, this did not resolve Claimant's symptoms. He continued to have severe back pain and pain and numbness in his left lower extremity. Because of this, Capocelli operated again on May 5, 2016, performing an anterior lumbar fusion at L4-5. In this instance, Claimant suffered a complication from surgery in the form of an abdominal hematoma; this, too, had to be addressed surgically.

> In addition to the operations, Claimant has undergone other treatments as well. In addition to physical therapy, he has undergone pain management that has included multiple epidural steroid injections and the use of prescription narcotic medication. This has had only limited effectiveness. As a result of the medications, he has problems with his memory and experiences confusion-which he has termed "dumbfoundness." His left lower extremity shows signs of atrophy.

7

Claimant's outdoor activities have been curtailed because of the injury at issue. He is still able to drive, although he is concerned about doing so in light of the medication that he takes. The evidence shows that Claimant still works on the computer. The majority of his days are now spent at home, where he has to alternate sitting, standing, walking and lying down.

A functional capacity evaluation showed that Claimant demonstrated the ability to work in the Light category. Dr. Capocelli released him from treatment with a permanent partial impairment rating of nineteen percent (19%) to the body as a whole, and assigned him permanent restrictions. Those restrictions are no lifting more than 10 pounds frequently or 20 occasionally, no standing on a vibrating platform, and no bending, climbing or crawling. Later, Capocelli wrote that Claimant would need more breaks than an average worker-every two hours-and would be absent from work about once a month because of his condition.

Claimant went back to work on April 3, 2017. Unfortunately, AHTD had not adequately prepared for his return. His desk-which had a variable height extension-had been used for storage and had equipment on and around it. While Claimant testified that he felt that he was afraid of injuring himself had he moved anything, I credit Stewart's testimony that he was told not to do so. Stewart had others do this. There was trouble procuring a comfortable chair for his use; but I again credit Stewart's testimony that had one not been found, AHTD would have purchased one. Claimant's computer was missing. This stands to reason, given his lengthy absence from the job. But one was going to be set up for him, and his area was to be networked. Claimant testified that an officer with the Highway Police was sent to him to handle a technology issue. Claimant felt that he was not given the tools to address the issue and that he did not know what to do because of technological advances that had occurred in his absence; but I credit Stewart's testimony that he should have been able to handle the matter. It bears noting that Stewart, who was Claimant's supervisor, is also his friend. And he gave his frank assessment, which I credit that "I don't think [Claimant] made really an attempt" to return to work on April 3, 2017. Nonetheless, I do credit Claimant's testimony that the ultimate reason for his deciding to retire was the increase in pain and the "dumbfoundness" that he was experiencing the morning that he was back on the job at AHTD. Stewart corroborated Claimant's testimony that he "was in extreme pain." But the evidence also shows that AHTD was at least willing (albeit not ready that day) to accommodate his restrictions.

He has undergone two vocational evaluations. While Taylor wrote that Claimant "has a skill set that will allow him to return to the same or similar field that would be consistent with FCE," she did not furnish him any job leads. Owen, on the other hand, did so. These leads, and Claimant's applications to some of them, showed that he met the minimum qualifications for six positions. But he was not given an interview, let alone a job offer, in connection with any of them, despite the

8

fact that he has a skilled background in user support. I credit Owen's opinion that while Claimant has skills in an industry that is in high demand, his age, extended absence from the job market and physical limitations would have a negative impact on his job prospects.

Based on Claimant's testimony, I find that he is no longer motivated to return to work. He initially said that he would no longer take a job were one offered to him. Under further questioning, he qualified this by saying that he would do so if he were allowed to alternate sitting, standing, walking and lying down. It should be noted that Dr. Capocelli did not mandate this particular set of restrictions/accommodations.

In this case, after consideration of the foregoing, I find that Claimant has not met his burden of proving that he is permanently and totally disabled. Instead, I find that he has suffered wage loss disability of fifty percent (50%), and that he has established this by a preponderance of the evidence.

Appellants appealed the ALJ's decision, and on December 17, 2018, the Commission affirmed and adopted the ALJ's opinion as its own. Under Arkansas law, the Commission is permitted to adopt the ALJ's opinion. *SSI, Inc. v. Cates*, 2009 Ark. App. 763, 350 S.W.3d 421. In so doing, the Commission makes the ALJ's findings and conclusions the findings and conclusions of the Commission. *Id.* Therefore, for purposes of our review, we consider both the ALJ's opinion and the Commission's majority opinion. *Id.* This appeal followed.

## II. *Standard of Review*

In appeals involving claims for workers' compensation, the appellate court views the evidence in the light most favorable to the Commission's decision and affirms the decision if it is supported by substantial evidence. *Prock v. Bull Shoals Boat Landing*, 2014 Ark. 93, 431 S.W.3d 858. Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* The issue is not whether the appellate court might have reached a different result from the Commission, but whether reasonable minds could reach the result found by the Commission. *Id.* Additionally, questions concerning the

9

credibility of witnesses and the weight to be given to their testimony are within the exclusive province of the Commission. *Id.* Thus, we are foreclosed from determining the credibility and weight to be accorded to each witness's testimony, and we defer to the Commission's authority to disregard the testimony of any witness, even a claimant, as not credible. *Wilson v. Smurfit Stone Container*, 2009 Ark. App. 800, 373 S.W.3d 347. When there are contradictions in the evidence, it is within the Commission's province to reconcile conflicting evidence and determine the facts. *Id.* Finally, this court will reverse the Commission's decision only if it is convinced that fair-minded persons with the same facts before them could not have reached the conclusions arrived at by the Commission. *Prock, supra.*

## III. *Wage-Loss Disability Benefits*

Appellants contend that substantial evidence does not support the Commission's findings that Abercrombie met his burden of proving that he is entitled to the additional fifty percent wage-loss disability benefit after considering his lack of motivation to return to the workforce. The crux of appellants' argument is that ADT was ready to make the necessary accommodations to allow Abercrombie to successfully return to work; yet Abercrombie elected to retire and remove himself from the workforce rather than make a legitimate attempt to return to work. Appellants allege that because Abercrombie rejected the bona fide offer of employment extended by ADT, he should not have been awarded any wage-loss disability benefits.

The wage-loss factor is the extent to which a compensable injury has affected the claimant's ability to earn a livelihood. *Ark. Highway & Transp. Dep't v. Wiggins*, 2016 Ark.

App. 364, 499 S.W.3d 229. When a claimant has an impairment rating to the body as a whole, the Commission has the authority to increase the disability rating based on wage-loss factors. *Id*. The Commission is charged with the duty of determining disability based on consideration of medical evidence and other factors affecting wage loss, such as the claimant's age, education, work experience, motivation, postinjury income, demeanor, and credibility. *Id*.; Ark. Code Ann. § 11-9-522 (Repl. 2012). Arkansas Code Annotated section 11-9-522 provides the following in pertinent part:

> (b)(1) In considering claims for permanent partial disability benefits in excess of the employee's percentage of permanent physical impairment, the Workers' Compensation Commission may take into account, in addition to the percentage of permanent physical impairment, such factors as the employee's age, education, work experience, and other matters reasonably expected to affect his or her future earning capacity.
>
> (2) *However, so long as an employee, subsequent to his or her injury*, has returned to work, has obtained other employment, or *has a bona fide and reasonably obtainable offer to be employed at wages equal to or greater than his or her average weekly wage at the time of the accident, he or she shall not be entitled to permanent partial disability benefits in excess of the percentage of permanent physical impairment* established by a preponderance of the medical testimony and evidence.
>
> (c)(1) *The employer* or his or her workers' compensation insurance carrier *shall have the burden of proving* the employee's employment, or *the employee's receipt of a bona fide offer to be employed, at wages equal to or greater than his or her average weekly wage at the time of the accident.*

(Emphasis added.) Additionally, Arkansas Code Annotated section 11-9-526 states that

> [*i*]*f any injured employee refuses employment suitable to his or her capacity* offered to or procured for him or her, he or she *shall not be entitled to any compensation* during the continuance of the refusal, *unless* in the opinion of the Workers' Compensation Commission, *the refusal is justifiable.*

(Emphasis added.)

Although appellants contend that appellee should be barred from any wage-loss disability benefits because he received a bona fide offer of employment but chose to retire only a few hours after reporting to work, the Commission disagreed. The employer has the burden of proving a bona fide offer of employment. Ark. Code Ann. § 11-9-522(c)(1). Moreover, we have previously stated that an employee must be capable of performing the required job activities in order for the proposed position to be considered a bona fide offer of employment. *Johnson Cty. Reg'l Med. Ctr. v. Lindsey*, 2014 Ark. App. 586, 446 S.W.3d 647; *Wal-Mart Assoc., Inc. v. Keys*, 2012 Ark. App. 559, 423 S.W.3d 683. Here, the Commission specifically credited appellee's testimony that the ultimate reason for his decision to retire was the increase in pain and the "dumbfoundedness" that he was experiencing the morning that he was back on the job at ADT. Stewart's testimony further corroborated appellee's testimony that he "was in extreme pain." In sum, appellants are requesting that we reweigh the evidence and credibility findings made by the Commission. However, although we may have weighed the evidence differently, it is the Commission's duty rather than ours to make credibility determinations, to weigh the evidence, and to resolve conflicts in medical opinions, evidence, and testimony. *See Ark. Highway & Transp. Dep't v. Work*, 2018 Ark. App. 600, 565 S.W.3d 138; *Gibson v. Wal-Mart Assocs., Inc.*, 2012 Ark. App. 560. The issue is not whether we might have reached a different result or whether the evidence would have supported a contrary finding. *SSI, Inc. v. Lohman*, 98 Ark. App. 294, 254 S.W.3d 804 (2007). Once the Commission has made its decision on issues of credibility, we are bound by that decision. *Emerson Elec. v. Gaston*, 75 Ark. App. 232, 58 S.W.3d 848 (2001).

12

Appellants additionally argue that appellee is barred from benefits because the Commission specifically found that he lacked motivation to work. However, we have previously stated that although a lack of interest in pursuing employment impedes the assessment of the claimant's loss of earning capacity, it is not a complete bar. *Lindsey*, *supra*. Lack of motivation to work is but one factor for the Commission to consider in addition to the many other relevant factors. *See id*.; Ark. Code Ann. § 11-9-522. The Commission may use its own superior knowledge of industrial demands, limitations, and requirements in conjunction with the evidence to determine wage-loss disability. *Lindsey*, *supra*. Here, the Commission credited Owen's opinion that while appellee has skills in an industry that is in high demand, his age, extended absence from the job market, and physical limitations would have a negative impact on his job prospects. Again, it is the Commission's duty rather than ours to make credibility determinations, to weigh the evidence, and to resolve conflicts in medical opinions, evidence, and testimony. *Gibson*, *supra*. Accordingly, we affirm the Commission's decision that appellee was entitled to 50 percent wage-loss disability benefits in this case.

Affirmed.

ABRAMSON and MURPHY, JJ., agree.

*Robert H. Montgomery*, Public Employee Claims Division, for appellants.

*Moore, Giles & Matteson, L.L.P.*, by: *Greg Giles*, for appellee.