Cite as 2021 Ark. App. 184

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV–20–504

|  |  |
|---|---|
| ROBERT PRATT<br><br>                          APPELLANT<br><br>V.<br><br>LANDERS MCLARTY<br>BENTONVILLE,<br>FEDERATED MUTUAL INS. CO.,<br>AND DEATH AND PERMANENT<br>TOTAL DISABILITY TRUST FUND<br>                           APPELLEES | **Opinion Delivered:** April 21, 2021<br><br>APPEAL FROM THE ARKANSAS<br>WORKERS' COMPENSATION<br>COMMISSION [NO. G902967]<br><br><br><br><br><br>AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant Robert Pratt appeals the June 26, 2020 decision of the Arkansas Workers' Compensation Commission (Commission) affirming and adopting the decision of the administrative law judge (ALJ) that appellant was not performing employment services at the time of his injury on April 11, 2019. Appellant contends that the Commission's decision is not supported by substantial evidence. We affirm.

Appellant worked for Landers McLarty Bentonville at its Chrysler Dodge Jeep Dealership (Jeep) as a sales representative. He was hired in that capacity on December 15, 2015, and his duties included meeting and greeting customers, showing customers vehicles, getting paperwork together for the sale of vehicles, detailing vehicles, and other duties that went with the sale of vehicles. During the summer, his work hours were from 8:00 a.m. to

8:00 p.m., and when he was not making sales, he was expected to walk the lots and ensure that everyone was taken care of. On April 11, 2019, appellant arrived at work and parked in the designated parking section located on the Buick GMC (GMC) premises.[1] He crossed through the culvert dividing the two lots to reach Jeep. However, as he was walking up the hill, he fell backwards and injured his knee. Once he arrived at Jeep to clock in, he informed the sales manager, Brian Koller, of his fall and was told to go "get checked out." Appellant initially presented to the emergency room at Mercy Hospital with complaints of leg pain and was diagnosed with a sprain of the left knee. Appellant was seen in the Mercy Clinic on April 16 by his primary-care physician, Dr. Kimberly Chapman, for a follow-up. Appellant was subsequently seen by several physicians over the next few months and underwent physical therapy and a lumbar MRI scan. The MRI revealed a protrusion/annular fissure at the L5-1 level that abutted—but did not compress—the exiting L5 nerve. Appellant also underwent an EMG, which was read as normal. At that time, Dr. Barbara Bess indicated that there was no electrodiagnostic evidence of lumbosacral radiculopathy and noted that appellant's presentation was unusual. Dr. Bess opined that other neurological conditions should be considered, including involvement of the central nervous system or an autoimmune or other systemic process. Appellant filed a claim stating that he suffered a compensable back injury on April 11 as a result of his fall. Jeep denied compensability.

---

[1]GMC is adjacent to Jeep.

A hearing was held before the ALJ on September 18. Charles Neilson testified on appellant's behalf. He stated that he began working at Jeep in June 2018 as a salesman and that he worked with appellant. He stated that he and others parked at GMC, which was about 100–150 feet from Jeep. He testified that he and others would cross the rocky culvert to get from one lot to the other. He denied ever being instructed not to cross the culvert prior to appellant's injury. However, he stated that there were several meetings after appellant's fall in which they were informed that disciplinary actions would be taken if they were caught crossing the culvert. Neilson admitted that he no longer works at Jeep and that he had gotten into some legal trouble following his departure.

On cross-examination, Neilson stated that he was terminated in August. He said that workers can park anywhere on two rows at the GMC lot. He agreed that he had no duties before clocking in. He also stated that he was not required to cross the culvert to clock in at Jeep as there was also a sidewalk between the lots. Additionally, he said that there was a way to clock in on the phone but that he had never done so.

On redirect, Neilson stated that employees crossed the culvert because it was faster than taking the sidewalk. He said that he witnessed other employees cross the culvert daily. On recross-examination, he testified that they could sell cars on any of the lots.

Appellant testified that he and other sales representatives had to park at GMC because there was limited space available for customers at Jeep. He said that April 11 was a "beautiful day," and he crossed the culvert as he normally did to go clock in. He stated that as he was walking up the hill, he went backwards and landed on his back. He said that initially, he only had pain in his knee. He stated that he informed Koller that he had fallen in the

culvert, and Koller's response was that "[he was] not supposed to be walking up that culvert." He said that he indicated to Koller that this was "the first time [he has] heard of it." Appellant stated that he was seen in the ER for knee pain and that by the next day, he had pain going up his hip and radiating into his back and down to his foot. He testified that he never had pain like he experienced after the fall and contended that it started getting "worse and worse." He admitted that he suffered from bursitis in his hips but insisted the bursitis did not interfere with his ability to perform his job duties at Jeep. He testified that he has undergone pain management and physical therapy due to his fall. He also said that he has taken medications, has been seen by orthopedics, "and [has done] several different things" since his injury. He stated that after he was released to return to work, he texted "Ms. Beverly and asked when [he] could come back. She pointed out that [he] would have to come back with a cane or walker and [he] never heard back from her." He denied having any issues with his back since he was a teenager. At the time of the hearing, he was forty-six years old. Appellant stated that his back pain varies from day to day and that he is still under treatment. He said that he currently suffers from tingling in his legs and feet, numbness in his left leg, spasms, shaking, and weakness. He stated that the symptoms in his legs were not present before his fall. He testified that he currently resides in Texas and is unable to work because his "legs won't let [him]."

On cross-examination, appellant stated that he would clock in before starting his workday. He admitted that he was not clocked in at the time of his fall. He stated that he was not being paid at the time of his fall and would generally not be paid unless he sold a vehicle. He said that there was no security gate he had to enter to get to the GMC lot and

4

that other people could also park on the lot. He admitted that he chose to walk through the culvert to get to work because otherwise, he would have to walk "quite a ways [sic] around to walk on the sidewalk." He testified that to cross the culvert, one would have to step over a little concrete wall, walk down a little grassy area, and then start making one's way back up the rocky area. He also stated that there was about a ten-to-fifteen-foot elevation change when going up the rocks. Appellant testified that at the time of his fall, he was not performing duties for Jeep. He stated that it was possible that some rocks moved as he was going up the culvert, causing him to fall. He said that if he had taken the sidewalk, he would not have encountered the rock that caused him to fall. Appellant stated that no one from Jeep instructed him not to cross the culvert. He said that on April 11, he was not running late or worried about clocking in late. He admitted that he could have taken the sidewalk and still arrived at work on time. He testified that he refused to sign the reprimand following his fall because he was never "pre-warned" about crossing the culvert. He stated that no one witnessed his fall, but he reported it to Koller after it happened. He said that he informed Koller that he had fallen on his back and twisted his leg. He stated that he did not immediately experience back pain following his fall. Appellant stated that he would be surprised if a chiropractor report from December 2018 indicated he was experiencing spasms in his lower back. He agreed that the photos of the culvert, sidewalk, and lots were accurate depictions. He stated that he could have taken the sidewalk and agreed that it was a safer way to get between the two lots. He testified that he was asked to sell vehicles on the other lots also. He indicated that he was unaware why Jeep chose the GMC parking lot for the sales representatives to park.

On redirect, appellant stated that he was required to park in the GMC lot but had to report to work at Jeep. He said that he normally crossed the culvert because "it was quicker entrance to the building." He stated that he was never told by anyone in management not to cross the culvert. He indicated that when he parked in the designated two rows at GMC, he was following management's instructions. He testified that a written reprimand was issued to him "quite a while [after his fall]." He stated that he refused to sign the reprimand because he was never informed of the policy. He stated that he was paid commission when he sold a car, and when he did not sell a car, money came from a draw which had to be repaid from any subsequent commission earned. He said that he was not paid by the hour and that he had to clock in just in case an accident happened while on the premises. He stated that although he heard that he could clock in from the parking lot, he had never done so. He said that when he was seen by the chiropractor in 2018 with his bursitis, she adjusted his hips, back, and neck. However, he denied specifically complaining about his back. On recross-examination, appellant stated that Koller reprimanded him verbally when he reported the fall. He admitted that regardless of whether he was told not to cross the culvert, he did not have to cross it to get to Jeep. However, he stated that he done so because it was the shortest route.

Koller testified that he has been a sales manager at Jeep for two years. He stated that he was appellant's immediate supervisor. He said that the designated parking area for the sales representatives is an open lot and does not require them to pass through a security gate. He stated that parking at Jeep is limited due to the amount of inventory. He said that the GMC lot was chosen because it has easy access and is well lit. He stated that employees

could clock in on their phones based on their proximity to Jeep. He denied that appellant would have any job responsibilities prior to clocking in. He also indicated that appellant would not be paid for time he worked prior to clocking in. He stated that he told appellant that he was not supposed to cross the culvert when appellant notified him of the fall. He said that appellant complained about injuring his knee but made no mention about falling on his back or experiencing back problems. Koller testified that to cross the culvert, one would have to cross a small retaining wall, go down into the ditch, and climb back out through the top of the culvert. He stated that the culvert is full of rocks and there is an elevation change depending on where one crossed. He said that there was a rule that no employees were to be in the culvert at all. He stated that it was obvious that you might hurt yourself crossing the culvert. Additionally, he said that the sidewalk provided clear and easy access between the two lots. He stated that based on his calculations, the sidewalk is a shorter distance between the facilities. Koller said that the rule about not crossing the culvert was in place before appellant fell. He stated that the rule has been mentioned in the morning sales meetings several times and that appellant's crossing the culvert was in violation of Jeep's verbal policy. He testified that appellant was written up for violating the policy because appellant was familiar with the policy and had been in at least one meeting in which the policy was discussed. He stated that there was also a grassy area that employees could cross if they did not want to take the sidewalk. Koller testified that Neilson was terminated for taking an advance and failing to show up for work.

On cross-examination, Koller stated that the owner of Jeep fired Neilson. He stated that Jeep only has enough parking spaces for inventory and limited customer parking. He

7

said that there would have been one—if not multiple—meetings in which the culvert policy was mentioned when appellant was present. He acknowledged that appellant wears a hearing aid but disagreed that the meetings tend to get loud because only one person runs the meetings. He stated that appellant would not be paid until he clocked in and that based on his performance, he would receive either commission or minimum wage. He said that in April, sales meetings were held six days a week at 8:30 a.m. He said that there was no rule against an employee clocking in in the parking lot if the employee was close enough to pick up the Wi-Fi. He stated that it was possible that a salesperson would sometimes run into a customer wandering around the parking lot and start talking to the custmer on their way into the facility.

Jonathan Wichman testified that he is the general manger, and in that capacity, he supervises all the employees. He stated that anyone can park in the GMC lot and that there is no designation where the sales representatives must park within the lot. He said that employees are required to either clock in on their phones or inside Jeep before they begin their shifts. He stated that it was his decision to have the sales representatives park at GMC. He said that the lot was similar in distance as the lot located in the back of Jeep and that visibility was greater. He testified that appellant would not have any job responsibilities before clocking in and would not be paid before doing so. He denied that appellant was performing any job duties at the time of the fall. He stated that there was a policy forbidding the crossing of the culvert, which was conveyed to the sales representatives. He said that when the parking lots were changed, he held a meeting and informed every salesperson not to cross the culvert. He stated that he had meetings on more than one occasion during

appellant's employment reiterating the policy. He said that any employee seen crossing the culvert would be reprimanded. He admitted that the policy was discussed in meetings following appellant's fall to remind everyone that they were not to cross the culvert and of the dangers associated with doing so. He testified that appellant violated company policy by crossing the culvert on April 11. He stated that he was familiar with the circumstances leading to Neilson's termination and that Neilson was terminated by the owner because Neilson was granted an advance and did not show up to work after receiving the advance.

On cross-examination, Wichman stated that he held the meeting informing employees not to cross the culvert the day after the lots were changed. He said that he was unsure if appellant was present at that meeting. He testified that he ran most of the sales meetings. He stated that he expected an employee to speak to a customer even if he was not yet clocked in. He said that sales representatives were paid based either on their sales or the hours they worked, depending on their performance.

On redirect, Wichman testified that the policy was conveyed in the meeting following the parking-lot change and in subsequent meetings that took place before and after appellant's fall.

Appellant testified on rebuttal that it was sometimes hard to hear Wichman during the meetings when other people were talking. He stated that he generally attended all the sales meetings; however, he denied ever hearing that they were not supposed to cross the culvert. He said that almost all the men crossed the culvert because it was a shorter distance. Appellant stated that he did not deny that the policy was never given, but he never heard it. He said that during the meetings, he normally sat on the first two rows so that he could

9

look at the speaker and hear. He stated that he was unsure if he ever notified Wichman that he was having trouble hearing in the meetings.

Wichman testified on rebuttal that no one talked while he was speaking. He also denied being informed that appellant was having trouble hearing the meetings.

Deposition testimonies were admitted during the hearing. Yelitza Aguirre testified that he worked at Jeep until just before appellant's fall. He stated that he was employed at Jeep when the parking lots were switched over to GMC. He said that sales meetings were held every morning while he was there. He testified that it was policy that they were not to cross the culvert to get between the two lots and that the policy was given verbally in different meetings. He stated that appellant was at the meetings and usually sat in front close to the board. He denied that others talked while Wichman was talking at the meetings. He said that he followed policy and did not cross the culvert.

On cross-examination, Aguirre stated that he parked in one of the two designated rows and walked to Jeep. He said that he never clocked in from the parking lot because he did not want to bother with the app. He stated that other people, including customers, would also park in the GMC lot. He testified that he witnessed employees crossing the culvert even though the policy against it was mentioned in multiple meetings. He stated that he never noticed a problem with appellant's hearing.

Rick Izquierdo testified by deposition that he has been a sales representative at Jeep since 2017. He stated that the parking lot in which the sales representatives parked was open to anyone. He said that there was a designated area for them to park but not a designated spot. He testified that there was a policy forbidding them to cross the culvert.

He stated that the policy was announced at numerous meetings and that appellant was present at those meetings. He said that it was possible to reach Jeep from the designated parking lot without crossing the culvert.

On cross-examination, Izquierdo testified that the policy was mentioned in meetings about once a month. He denied ever crossing the culvert. He said they were told not to cross the culvert because it is dangerous. He stated that using the sidewalk to reach Jeep from the lot did not take that much more time and it required less physical effort. He said that he usually clocked in at the building, but if he was running behind, he used the app on his phone. He stated that the designated parking lot is too far away to clock in using the app. He testified that if he ran into a customer before reaching the building to clock in, he would help the customer because his pay is based on commission, not hours worked. He opined that clocking in is for insurance purposes and for Jeep to keep a log of who is there. He stated in the situation where he met a customer before clocking in, he would have an initial conversation with the customer and, at some point, let the customer know that he needed to go inside and would offer to have the customer follow him.

The ALJ found that appellant failed to prove that he was performing employment services at the time of his fall. The opinion stated in pertinent part:

> In summary, a compensable injury does not include an injury which occurs when employment services are not being performed. Here, by claimant's own admission, he had not clocked in and was not being paid by the respondent at the time of his fall on April 11. Furthermore, claimant specifically testified that he was not performing any job duties at the time of his fall on April 11, and according to testimony of respondent's witnesses[,] claimant had no job duties prior to clocking in on April 11. Finally, based on the testimony of several witnesses at the hearing and by deposition, which I find to be credible, claimant and other employees were specifically instructed not to cross the culvert in order to reach the Jeep lot. Thus,

by crossing through the culvert on the morning of April 11, claimant was in direct violation of the respondent's policy.

Based on the foregoing, I find that claimant was not performing employment services at the time of his fall on April 11, 2019; therefore, claimant cannot meet his burden of proving by a preponderance of the evidence that he suffered a compensable injury on that date.

Appellant appealed the ALJ's decision to the Commission, which affirmed and adopted the ALJ's opinion as its own. Under Arkansas law, the Commission is permitted to adopt the ALJ's opinion.[2] In so doing, the Commission makes the ALJ's findings and conclusions the findings and conclusions of the Commission.[3] Therefore, for purposes of our review, we consider both the ALJ's opinion and the Commission's majority opinion.[4]

When reviewing a decision of the Commission, we view the evidence and all reasonable inferences deducible there from in the light most favorable to the findings of the Commission.[5] This court must affirm the decision of the Commission if it is supported by substantial evidence.[6] Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion of the Commission.[7] We reverse the Commission's decision only if we are convinced that fair-minded persons could not have

---

[2] *SSI, Inc. v. Cates*, 2009 Ark. App. 763, 350 S.W.3d 421.

[3] *Id.*

[4] *Id.*

[5] *Evans v. Bemis Co., Inc.*, 2010 Ark. App. 65, 374 S.W.3d 51.

[6] *Id.*

[7] *Id.*

reached the same conclusion with the same facts before them.[8]  Questions regarding the credibility of witnesses and the weight to be given to their testimony are within the exclusive province of the Commission.[9]

In Arkansas workers'-compensation law, in order for an accidental injury to be compensable, it must arise out of and in the course of employment.[10]  An employee is performing employment services when he or she is doing something that is generally required by his or her employer.[11]  We use the same test to determine whether an employee is performing employment services as we do when determining whether an employee is acting within the course and scope of employment.[12]  The test is whether the injury occurred within the time and space boundaries of the employment when the employee was carrying out the employer's purpose or advancing the employer's interest, either directly or indirectly.[13]  Moreover, whether an employee was performing employment services within the course of employment depends on the particular facts and circumstances of each case.[14]

---

[8]*Id.*

[9]*Wall Farms, LLC v. Hulsey*, 2017 Ark. App. 624, 534 S.W.3d 771.

[10]Ark. Code Ann. § 11-9-102(4)(A)(i) (Repl. 2012).

[11]*Cont'l Constr. Co. v. Nabors*, 2015 Ark. App. 60, 454 S.W.3d 762.

[12]*Pifer v. Single Source Transp.*, 347 Ark. 851, 69 S.W.3d 1 (2002).

[13]*Id.*

[14]*Webster v. Ark. Dep't of Corr.*, 2017 Ark. App. 558, 537 S.W.3d 731.

13

As a general rule, a claimant who has fixed hours and places of employment is not performing employment services when the claimant is traveling between home and the job because this falls within the "going and coming rule."[15] Generally, an employee who is injured while walking to or from his or her vehicle in the parking lot before or after work is not performing employment services.[16] However, whether the claimant is technically "on" or "off" the clock is not dispositive.[17]

Appellant contends that his situation is similar to employees who are on duty despite not being clocked in. He cites four cases that merit discussion. In *Texarkana School District v. Conner*,[18] Conner worked for the district as a janitor and broke his leg while opening a locked gate upon his return from his lunch break. The Commission found that the injury occurred while the claimant was advancing his employer's interests.[19] This court reversed the Commission, and our supreme court held that the Commission could credit Conner's testimony that as a janitor, he was on call once he returned to the District's premises.[20] The court further held that Conner was advancing his employer's interest when he was injured while attempting to open a locked gate in order to gain access to the District's parking lot.[21]

---

[15] *Id.*

[16] *Id.*

[17] *See Barrett v. C.L. Swanson Corp.*, 2010 Ark. App. 91.

[18] 373 Ark. 372, 284 S.W.3d 57 (2008).

[19] *Id.*

[20] *Id.*

In *North Little Rock School District v. Lybarger*,[22] Lybarger was a teacher's aide at Boone Park Elementary School. On the date of her injury, she was at the Lakewood campus for staff-development day.[23] After she had been released for lunch and instructed to report to Boone Park Elementary for further meetings afterwards, Lybarger broke her right leg while climbing stairs en route to the parking lot but before she had left the premises.[24] We affirmed the Commission's finding that she was performing employment services.[25] Although she was released to lunch, she was required during that time to exit the building and travel from one campus where she was performing employment services to another campus where she would perform employment services.[26] Moreover, in order to report to Boone Park Elementary, Lybarger first had to walk through and exit the Lakewood buildings.[27] Therefore, by walking through the Lakewood campus, we held that she was carrying out the employer's purpose and advancing her employer's interest in that she was leaving Lakewood and preparing to report to Boone Park Elementary.[28]

---

[21]*Id.*

[22]2009 Ark. App. 330, 308 S.W.3d 651.

[23]*Id.*

[24]*Id.*

[25]*Id.*

[26]*Id.*

[27]*Id.*

[28]*Id.*

In *Caffey v. Sanyo Manufacturing Corp.*,[29] we held that an employee who had presented a security badge at two guard shacks and had entered the manufacturing plant but who had not yet clocked in when she slipped and fell in the hallway was performing employment services because her employer required her to go through those obstacles before getting to her workstation.

In *Foster v. Express Personnel Services*,[30] our court held that an employee may be compensated for an injury that occurs even before she reaches her workstation or before she is "on the clock" if she is performing a service that is required by her employer and is directly or indirectly advancing her employer's interests. Foster, a temporary clerical worker, was injured in the service-bay area of McClarty Auto Mall at 7:50 a.m., ten minutes before her official workday began.[31] The *Foster* opinion noted that she would have been required to perform her specific job duties while en route to her designated job site and was expected to advance her employer's interests away from her desk, even if Foster had not actually been engaged in work duties when she was injured.[32] The *Foster* opinion rejected any application of the going and coming rule because Foster was already at the workplace; she was not driving to work nor was she injured in the parking lot.[33]

---

[29]85 Ark. App. 342, 154 S.W.3d 274 (2004).

[30]93 Ark. App. 496, 222 S.W.3d 218 (2006).

[31]*Id.*

[32]*Id.*

[33]*Id.*

Here, although there was testimony from witnesses that sales representatives were expected to speak to customers even if they were not clocked in, there was no testimony that appellant was assisting a customer at the time of his fall or that he had ever done so before clocking in. There also was no evidence that appellant had to go through security obstacles before reaching Jeep and clocking in. Finally, there was no evidence that appellant's injury took place in an area where he was expected to be engaged in work duties.

Appellant also contends that his injury is compensable because he was required to park in the GMC lot, and that by doing so, he was carrying out Jeep's purpose or interests. This argument is without merit. Appellant's fall took place in an area he was warned not to be while on his way to clock in for work, and it falls squarely within the "going and coming rule." It should be noted that appellant's injury would still not be compensable had he fallen in the parking lot or on the sidewalk leading to the building since he was not preforming employment services. Appellant conceded in his testimony that his fall took place at a time when he was not performing any job responsibilities for Jeep. Both Koller and Wichman also testified that appellant had no job responsibilities prior to clocking in. Merely parking in a designated parking area opened to the public is not enough to lead us to hold that appellant was performing employment services once he parked in the lot. Therefore, we affirm the Commission's finding that appellant failed to prove he suffered a compensable injury on April 11 as he was not preforming employment services at the time of his fall.[34]

---

[34]We do not reach the merits of appellant's other two points: (1) appellant's behavior in taking the culvert path does not rise to a willful intent to injure himself, and (2) substantial

Affirmed.

VIRDEN and MURPHY, JJ., agree.

*Tolley & Brooks, P.A.*, by: *Evelyn E. Brooks*, for appellant.

*Mayton, Newkirk & Jones*, by: *Rick Behring Jr.*, for appellees.

---

evidence supports a finding that appellant suffered a compensable back injury, since we have already determined that appellant was not preforming employment services at the time of his injury.