2010 Ark. App. 585

**Michael MAIN, Appellant**

v.

**McGehee METALS, Appellee.**

**No. CA 10–111.**

Court of Appeals of Arkansas.

Sept. 15, 2010.

Kenneth E. Buckner, Pine Bluff, for Appellant.

Michael J. Dennis, Bridges, Young, Matthews & Drake PLC, Pine Bluff, for Appellee.

LARRY D. VAUGHT, Chief Judge.

Appellant Michael Main appeals a decision of the Arkansas Workers' Compensation Commission finding that he was not entitled to an additional anatomical-impairment rating pursuant to Ark.Code Ann. § 11–9–521 (Repl.2002). He also claims that the Commission erred in its decision to allow his employer an offset for an advanced payment of compensation as defined by Ark.Code Ann. § 11–9–807 (Repl. 2002). We affirm in part and reverse in part.

Main, who was born on October 23, 1968, has a high-school education. For approximately eighteen years, he worked for McGehee Metals. His jobs ranged from operating heavy equipment and ordering and selling parts to performing mechanic work. On September 19, 2005, Main was shot during a robbery with a sawed-off shotgun armed with three-inch, magnum-steel shot.[1] He sustained injuries to his left arm and torso (chest, liver, and intestinal track), resulting in a prolonged hospitalization, numerous surgeries, post-traumatic-stress syndrome, and depression with psychotic (hallucinations) features. Dr. Charles Mabry treated Main's chest and abdomen, and Dr. John Lytle treated Main's left elbow. Main also received counseling at Southeast Arkansas Behavorial Healthcare from Drs. Sizemore, Wooten, and Malik.

On August 24, 2007, Dr. Lytle assessed an eighty-eight percent impairment rating to Main's left arm based on nerve dysfunction, loss of the elbow joint, and loss of hand strength. In his report, Dr. Lytle stated that Main had reached maximum medical improvement and further stated:

I have recommended to Mr. Main that he have further surgery to stabilize his left elbow. . . . He has restricted lifting of any weight with his left arm. He has no functional use of the left arm or hand. . . . I have recommended effusion of the left elbow. According to the 'Guides to the Evaluation of Permanent Impairment,' Fourth Edition, as published by the American Medical Association, I see his permanent impairment to the left arm to be a combination of the nerve dysfunction from the complete transsection of the ulnar nerve above the elbow with injuries to the radial nerve, combined with the loss of the elbow joint from massive trauma from gunshot wound, and the loss of strength in his hand. The impairment due to the loss of motor and sensory function of the ulnar nerve above mid forearm is 50 percent to the upper extremity. This is rated according to table 15 page 54. The impairment due to the loss of the elbow joint is 70 percent to the upper extremity and 42 percent to the person as a whole according to table 18 page 58. The impairment due to the loss of strength is computed to be a 45 percent strength index loss. According to table 34 page 65 is a 20 percent upper extremity impairment. Using the combined value table on page 324 for each of these numbers this is equivalent to 88 percent to the upper extremity. Using table three page 20. This is then equivalent to 53 percent to the person as a whole. I have recommended to Mr. Main that he consider an arthrodesis of the elbow.

---

1. There is no dispute that on September 19, 2005, an employee-employer relationship existed between Main and McGehee Metals. Furthermore, the parties agreed that on this date he sustained a compensable injury at compensation rates of $320/$240. McGehee Metals also accepted responsibility for medical expenses and an eighty-eight percent impairment rating to Main's left arm, as assessed by Dr. Lytle (at the end of the healing period on August 24, 2007).

I do not expect that this would alter his permanent impairment however certainly it would make his daily life more functional.

According to Dr. Lytle's December 25, 2008 report

Michael Main sustained a massive extraordinary wound to his [left] arm. He has complete loss of function of the ulnar nerve and an unstable elbow joint. He can move his index finger, long finger and thumb with limited amount of grip. This is not very functional. I would say that his use of the arm is only slightly better than an amputation. You have previously reviewed the permanent impairment rating and I feel that this is accurate.

Main's psychiatric records mention an incident where he was involved in a motor-vehicle accident after the robbery (in 2006) and sought chiropractic care. Two medical reports (and Main's own testimony) stated that Main's mental stress was exemplified by his reaction to a back-firing vehicle. Dr. Wooten's report of August 27, 2007, states that Main cannot work and is unemployable. Main also testified that his left hand remains cold at all times and that he developed post-traumatic-stress disorder (PTSD) as a result of the attack. He further stated that he is unable to work based on the cumulative effect of the PTSD, the side effects of medication, and his physical limitations.

On September 13, 2007, Main signed a Form AR–C, Claim For Compensation. He contended that he was entitled to additional benefits, including additional temporary total and temporary partial, additional permanent partial, additional medical expenses, rehabilitation, attorney's fees, child support, and "other." In fact, Main, who has no legal training and was unrepresented at the time, placed a check in every box.

The owner of McGehee Metals, Edward McGehee, is an eighty-two-year-old man who has been in the metal business for several decades. He testified that he was unaware of changes in the law concerning the requisite number of employees needed to trigger mandatory workers' compensation insurance. However, after this incident, he consulted an attorney and has remedied the situation by acquiring workers' compensation insurance for his employees.

Specifically, at the February 20, 2009 hearing, Edward McGehee was questioned by his attorney:

Q. Did you have any kind of insurance on your business before Mr. Main's situation?

A. No. . . .

Q. When he was hurt, did you realize you owed him some worker's (sic) compensation benefits?

A. Yeah, I knew I was going to have to pay worker's (sic) comp sooner or later.

Q. Okay. And did you pay for Mr. Main's [sic] medical bills?

A. Paid all his medical bills, hospital and everything.

Q. Do you have any idea how much you have paid on medical bills?

A. It's been over five hundred thousand dollars or more. . . . That's counting the wages and everything.

Q. Okay. Alright. Now you paid Mr. Main, you continued paying him his salary and that was four hundred and eighty dollars a week, is that right?

A. Yes sir.

Q. [All right.] Did you consider that to be a gift to Mr. Main?

A. No, I didn't consider it a gift, I figured I was going to have to pay it sooner or later through workman's comp.

Q. Okay, did you understand that under workman's comp, you might have to pay him less than four hundred and eighty dollars a week?

A. Well, I didn't at first, I figured he needed the money and his wife was sick too, so that's why I paid it for a long time. Until they told me different. . . .

Q. Did you know whether or not it was more than four hundred eighty dollars a week or less than that four hundred and eighty dollars a week?

A. Less.

Q. And after you learned that it was less, did you continue to pay him four hundred and eighty dollars a week?

A. For a while I did.

Q. Why did you do that?

A. Well, his wife had cancer and I thought I'd help him a little bit. . . .

Q. Okay, so was the difference in what you owed him and what you were paying him, was that a gift for Mr. Main?

A. No, it wasn't a gift.

Q. What was it, what did you think it was?

A. I thought I was getting ahead a little on the worker's [sic] comp. . . .

Then, Edward McGehee was cross-examined by Main's attorney:

Q. Did you ever tell him that this money you were paying him was an advance payment of compensation?

A. No sir.

In sum, McGehee testified he had paid Main's medical expenses and continued his salary because he knew that he would have to pay workers' compensation "sooner or later." However, McGehee also testified he was trying to help Main financially because Main's wife was suffering from cancer. Of particular note is the fact that McGehee continued to pay Main's full salary for a time after he found out he owed only 66 2/3% of Main's average weekly wage. Furthermore, Main testified that there was never any discussion of "advanced payments of compensation." McGehee confirmed Main's testimony on this topic. Main stated that he knew McGehee did not have insurance and thought McGehee was continuing to pay the full-salary amount to keep from getting in trouble with the law.[2] Finally, McGehee also testified that he approached Main about returning to work but Main declined his offer of light duty.[3] Main claimed that he had no use of his left arm and that his mental health—specifically the PTSD—prevented him from returning to work. McGehee responded that he observed Main splitting wood and using his left hand to steady the wood. Main denied this accusation.

For his first point on appeal, Main contends that the employer is not entitled to a credit for the salary paid because there was no agreement that he was receiving an advance payment of compensation. Main received his full salary ($480 weekly) until the end of 2007. On January 1, 2008, McGehee Metals changed the payments to $213 a week. On December 20, 2008, the rate was adjusted to $240, and payments continued until February 20, 2009. McGehee later conceded that the correct compensation rate was $240. However, it declined to pay attorney's fees on the error or make up the difference of $27 weekly. The employer took the position that it had

**2.** Sanctions can be assessed against employers who fail to obtain workers' compensation coverage. Ark.Code Ann. § 11–9–401, § 11–9–406.

**3.** McGehee Metals obtained a release from Dr. Lytle but not from the mental-health clinic.

already overpaid the claim. According to Ark.Code Ann. § 11–9–807,

> (a) If the employer has made advance payments for compensation, the employer shall be entitled to be reimbursed out of any unpaid installment or installments of compensation due.
>
> (b) If the injured employee receives full wages during disability, he or she shall not be entitled to compensation during the period.

■ Case law makes a distinction between "advance payments of compensation" and payment of "benefits, wages and gratuities." *Southwestern Bell Tel. Co. v. Siegler*, 240 Ark. 132, 398 S.W.2d 531 (1966). These cases usually involve payments from third parties (group insurance, disability plans) that result in benefits that exceed a salary. Act 796 of 1993 addressed this issue in the offset provisions outlined in Ark.Code Ann. § 11–9–411. The amount in excess of wages paid over the weekly compensation rate *cannot* be credited against an award of future benefits *unless both parties intended* that the payments be compensation in advance. *Looney v. Sears Roebuck*, 236 Ark. 868, 371 S.W.2d 6 (1963) (emphasis added); *Varnell v. Union Carbide*, 29 Ark.App. 185, 779 S.W.2d 542 (1989).

In this case, the ALJ relied on these cases and concluded that the "employer's reasons for continuing the claimant's salary involved some gratuity as he was trying to help the claimant's family not only because of the claimant's severe injuries but also because of his wife's illness." But the Commission reversed that decision. The Commission noted Main's position that McGehee never mentioned the phrase "advance payment of compensation to him," but still concluded that "both parties knew Edward McGehee was making voluntary advance payments of reasonably necessary medical treatment and indemnity benefits to the claimant." The Commission then ordered that McGehee be allowed an offset for the overpayments.

For reversal, Main relies on *Varnell*, which holds:

> When an employer continues to pay salary or wages to an injured employee during any time of injury, and such payments are in excess of workmen's compensation benefits, then when a workmen's compensation award is subsequently made, the excess of the wages paid over the weekly compensation award cannot be deducted from the award. The policy of employers to pay an injured employee the prevailing wage scale while inactive during an injury period is in line with the modern concepts of employer-employee relations and is to be encouraged, but the employer cannot make such payments and later claim credit for the excess as against an award made.

*Varnell*, 29 Ark.App. at 191, 779 S.W.2d at 546.

■ In this case, there is no showing that *both* parties intended for the salary paid to be advance payment of compensation. In fact, McGehee unequivocally testified that he never informed Main that the money he was being paid was an advance payment of compensation. To find otherwise requires conjecture and speculation, neither of which are permitted in this analysis. Simply put, in order to receive an offset, McGehee had the burden to show that both parties intended that the payment be an advance payment of workers' compensation. The record before us shows no such proof. As such, we reverse the Commission on this point because its decision is not supported by substantial evidence.

■ Next, Main contends that because he has no functional use of his injured arm

and hand[4] the Commission's finding that he is entitled to only an eighty-eight-percent impairment rating is not supported by substantial evidence. "Permanent impairment" has been defined as any permanent functional or anatomical loss remaining after the healing period has ended. *Johnson v. General Dynamics,* 46 Ark.App. 188, 878 S.W.2d 411 (1994). Any determination of the existence or extent of physical impairment shall be supported by objective and measurable physical or mental findings. Ark.Code Ann. § 11–9–704(c)(1)(B).

■ The Commission has adopted the Guides to the Evaluation of Permanent Impairment (4th ed. 1993), published by the American Medical Association for the assessment of anatomical impairment. Ark.Code Ann. § 11–9–521(h); *Workers' Compensation Laws and Rules, Rule 099.34.* The Commission is authorized to decide which portions of the medical evidence to credit and to translate this medical evidence into a finding of permanent impairment using the AMA Guides. *Avaya v. Bryant,* 82 Ark.App. 273, 105 S.W.3d 811 (2003) (citing *Polk County v. Jones,* 74 Ark.App. 159, 47 S.W.3d 904 (2001)). The Commission may assess its own impairment rating rather than rely solely on its determination of the validity of ratings assigned by physicians. *Id.*

Here, the ALJ found that Main had no functional use of his arm and awarded him additional benefits. The Commission reversed. In its reversal, the Commission relied on Dr. Lytle's August 24, 2007 report assigning Main an eighty-eight-percent impairment rating pursuant to the AMA Guides. The Commission specifically noted that Dr. Lytle opined that Main had restricted lifting with his left hand and, in a later report, noted that Main

could move his index finger, long finger, and thumb with some limited grip. The Commission also relied on Main's own words that he did have some functional use of his left arm. Based on this evidence, the Commission found that Main had not suffered "permanent total loss of use of a member" in accordance with Ark.Code Ann. § 11–9–521(e). Because the Commission has the authority to determine permanent impairment, *Pollard v. Meridian Aggregates,* 88 Ark.App. 1, 193 S.W.3d 738 (2004), and there is substantial evidence to support its finding, we affirm on this point.

Reversed in part; affirmed in part.

PITTMAN and HART, JJ., agree.

---

4. This claim is based on the opinion tendered in Dr. Lytle's report of August 24, 2007.