Cite as 2021 Ark. App. 497

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV–21–218

| | |
|---|---|
| ARKANSAS FORESTRY COMMISSION; AND ARKANSAS INSURANCE DEPARTMENT, PUBLIC EMPLOYEE CLAIMS DIVISION<br><br>APPELLANTS | **Opinion Delivered** December 8, 2021<br><br>APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION [NO. G707642] |
| V.<br><br>THOMAS LINDSEY<br><br>APPELLEE | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellants, the Arkansas Forestry Commission (the Forestry Commission or employer) and the Arkansas Insurance Department, Public Employee Claims Division (the Insurance Department or insurance carrier) (collectively appellants), appeal from a February 19, 2021, opinion by the Arkansas Workers' Compensation Commission (Commission) affirming and adopting the findings of fact and conclusions of law made by the administrative law judge (ALJ) in favor of appellee, Thomas Lindsey (Lindsey or claimant). The Commission unanimously determined that Lindsey had met his burden of proof in demonstrating that (1) he sustained a permanent anatomical impairment in the amount of 50 percent to the right lower extremity and that his August 18, 2017, compensable right–knee injury was the major cause of this impairment; and (2) Dr. Byrd's 50 percent impairment rating to Lindsey's right lower extremity is supported by objective and

measurable physical findings. Appellants argue that substantial evidence does not support these findings. We affirm.

## I. *Relevant Facts*

Lindsey has been employed with the Forestry Commission for approximately thirty years as a county range supervisor, which is now called a "County Ranger III." The primary purpose of a County Ranger III is fire control. The job duties of a County Ranger III require an inspection of timber on both public and private land to measure and document the size and amount of timber. Lindsey testified that these inspections require him to walk extensively over harsh terrain, operate a bulldozer, and to perform the duties of a firefighter when necessary. Lindsey further testified that he is required to undergo physical testing to ensure he is capable of performing his duties, including demonstrating that he is able to walk a mile within sixteen minutes and undergoing a physical examination by a physician.

Lindsey injured his right knee while working for the Forestry Commission in 2011 after tripping and falling in the woods. Appellants accepted the injury as compensable, and Dr. Jason Brandt diagnosed Lindsey with a torn meniscus and performed an arthroscopic procedure to repair it. At that time, Dr. Brandt noted that he advised Lindsey that "there may be persistent arthritic symptoms post-op." However, according to Lindsey's testimony, he had no trouble performing his job duties following the 2011 surgery until after his second work-related injury in 2017, which is the subject of this appeal. Although Lindsey admitted that he experienced sporadic soreness from overactivity, Lindsey testified that he did not take any regular medication for pain or arthritis or any have other symptoms. In the years following Lindsey's first surgery in 2011, Lindsey saw Dr. Michael Crawley, his "family

2

doctor," to fulfill his physical-examination requirements for work. In Dr. Crawley's office notes from those visits in September 2011, August and November 2012, September 2013, and February 2017, Dr. Crawley noted that Lindsey had discussed pain in his right knee to some degree. Lindsey received injections for his knee pain in August 2012, September 2013, and February 2017.

It is undisputed that Lindsey sustained a second compensable work-related injury to his right knee on October 18, 2017 (often referred to herein as "the second injury"). Lindsey was conducting an inspection on a private landowners' property when, as he was walking, he stepped over a small branch. His right knee made an audible "popping" noise and gave way, causing him to fall against a tree.

Appellants accepted this October 18, 2017, work-related injury as compensable and provided medical treatment. Lindsey was first seen in the emergency department. Danielle Marie Bruggemann, PA, noted that Lindsey had to use crutches and exhibited "decreased range of motion and swelling." The impressions indicated "[s]evere tricompartment degenerative changes of the right knee which have progressed since the prior study." Thereafter, Lindsey followed up with an orthopedic surgeon, Dr. Brandon Byrd, for further evaluation and treatment. On November 7, 2017, Dr. Byrd noted that a recent MRI showed "severe tricompartmental osteoarthritis to [Lindsey's] knee with a degenerative medial meniscus tear." Dr. Byrd further noted that Lindsey had

> swelling and a positive effusion to his knee. He is tender to palpation along the medial and lateral joint lines and the patellofemoral joint. He lacks about 10 degrees of full extension. He has 120 degrees of flexion with pain and crepitus. He has no instability to his knee. He has stable varus and valgus stressing and anterior and posterior drawer. He is neurovascularly intact distally.

3

Dr. Byrd discussed a total knee replacement with Lindsey, and a total right–knee arthroplasty was performed on December 4, 2017.

Ten months later, on September 11, 2018, Dr. Byrd released Lindsey back to full duty with no work restrictions, determined Lindsey had reach maximum medical improvement for his total knee arthroplasty, and assigned Lindsey a permanent impairment rating of 37 percent to the right lower extremity. Regarding the permanent impairment rating, Dr. Byrd wrote the following:

> This is an impairment rating for Thomas Lindsey who I saw on 09/11/2018. On that visit, he had reached maximum medical improvement for his total knee arthroplasty. At that visit, he was doing very well with no major problems and we released him back to full duty at work. Based on the Fourth Edition Guides to the Evaluation of Permanent Impairment, Page 85, after undergoing a total knee arthroplasty with a good result, he would have *a lower extremity disability of 37%* and a whole person disability of 15%.

(Emphasis added.)

On November 8, 2018, the Insurance Department sent the orthopedic surgeon, Dr. Byrd, a letter asking him to clarify whether the compensable second injury was the major cause of the 37 percent impairment rating to the lower extremity. The letter was short and concise and stated in its entirety: "Thanks for the report of the office visit of September 11, 2018. Please clarify if the [second] compensable injury was the 'major cause' (> 50%) of the impairment rating." The Insurance Department's letter provided Dr. Byrd with three choices: "Yes ___ Possibly ___ No ___." Dr. Byrd checked "Possibly" and returned the letter without any further explanation or comments. Several months later, on March 26, 2019, after reviewing Dr. Byrd's response wherein the doctor answered "Possibly" to the Insurance Department's question, Lindsey's counsel sent his own letter

4

asking Dr. Byrd whether the second work-related injury was the major cause of the permanent impairment rating. The attorney's letter contained additional verbiage and gave Dr. Byrd the same three options: "Yes," "Possibly," and "No." Again, several months passed, and on August 6, 2019, Dr. Byrd responded to Lindsey's counsel's letter by checking "Yes," indicating that the second work-related injury was the major cause of Lindsey's impairment.

Lindsey continued to receive medical treatment with Dr. Byrd. After a June 20, 2019, office visit, Dr. Byrd noted that Lindsey was overall improving but that he still had "occasional pain with activities, especially with up and down stairs and sometimes just walking." Dr. Byrd reevaluated Lindsey at that appointment and noted the following findings and assigned an updated impairment rating:

> EXTREMITY: Right knee shows his incision is well healed with no evidence of infection. There is very little swelling overall to his knee or leg today. With his range of motion, he lacks about 2 degrees of full extension. He has a full 125 degrees of flexion and his knee is stable to varus valgus stressing and anterior and posterior drawer testing. He is neurovascularly intact distally.
>
> . . . .
>
> PLAN: He is making great improvements. I think at this point he has reached MMI for his total knee arthroplasty and can go back to full activities as he can tolerate. We will see him back as needed.
>
> . . . .
>
> Impairment Rating
>
> Mr. Lindsey was a total knee arthroplasty that on 6-20-2019 felt he was doing as well as he could and reached MMI. At that visit, he lacked just a few degrees to full extension and had full flexion. His knee was overall stable to ligamentous exam. He just had occasional pain and walking and stairs. Based off of the Guide to the Evaluation of Permanent Impairment, Fourth Edition from the AMA, I am looking initially on Page 88, Table 66, rating knee replacement results and he came up with

5

a score of 80. And then looking on Page 85, Table 64, on total knee replacement, an 80 would give a fair result which would give a *50% lower extremity disability and a 20% whole person disability.*

(Emphasis added.) Thereafter, on October 29, 2019, Dr. Byrd wrote the following letter

To Whom It May Concern:

Mr. Lindsey was initially released from care on 9/11/2018. An impairment rating was done based on that visit. Mr. Lindsey followed up with possible circulation issues on 11/2/18. He continued coming in for follow-up appointments after being referred to a cardiovascular surgeon. He was seen 1/31/19, 4/2/19, 5/21/19, and 6/20/19. Mr. Lindsey's cardiovascular issues were being treated and his right knee was doing good. He was again placed at MMI and given an updated PPD rating. I have attached all the records along with the ratings. *I do believe within a medical degree of certainty that the 2017 injury is the major cause to Mr. Lindsey's permanent impairment and not a pre-existing condition.*

(Emphasis added.)

A deposition of Dr. Byrd was also taken on December 23, 2019. The two main points of contention were whether the second injury was the major cause of the impairment rating and whether the claimant was entitled to any impairment rating to the lower extremity. Although Dr. Byrd initially gave some inconsistent testimony regarding his opinion of whether the second compensable work injury was the major cause of Lindsey's disability or impairment, Dr. Byrd testified that he stood by his October 2019 letter opining that the second compensable work injury was the major cause for Lindsey's knee surgery and that the impairment rating was "based off having the knee replaced"—not for the underlying condition. Dr. Byrd explained that although Lindsey had a preexisting injury to his knee, Lindsey had a "pretty asymptomatic arthritic knee in [his] opinion" before the 2017 compensable work injury. Dr. Byrd also testified that his opinions were made within a medical degree of certainty. Throughout Dr. Byrd's deposition, he testified that he

6

thought the surgery resulted in a "good outcome." He later explained that his reference to a "good outcome" was not a reference to a "good" or "fair" category for assigning an impairment rating under the *American Medical Association* (*AMA*) *Guides*. Dr. Byrd further testified that his opinion was based on a combination of subjective and objective factors. When pressed on whether Dr. Byrd calculated the impairment ratings by using the table in the *AMA Guides* and what Lindsey told him on the day that he saw him, Dr. Byrd responded, "And on exam." Dr. Byrd testified that he reevaluated Lindsey for a second impairment rating because "he [Lindsey] wasn't as good as he was when we first released him, so, because he started having issues again, whether that was because he got back to work and was doing more, or whatever, I don't know, but it wasn't the same result, the exam was not the same as it was when we released him the first time."

Appellants controverted Lindsey's entitlement to the 50 percent permanent anatomical impairment rating to the right lower extremity, Lindsey's entitlement to permanent partial–impairment benefits, and attorney's fees. They more specifically contended that any permanent benefits should not be awarded because the second compensable injury was not the major cause of the disability or impairment and, alternatively, that there were no objective medical findings to support the alleged 50 percent rating. A hearing was held before the ALJ on February 7, 2020, in which the above evidence was presented. The ALJ filed an opinion on May 20, 2020, which made the following relevant findings:

**Major Cause**

. . . .

I found both the claimant and his supervisor to be credible witnesses, I do not find the gist of Dr. Byrd's written correspondence and deposition testimony to be confusing, conflicting, nor even subject to reasonable dispute. Even if I did so find, it is within the Commission's province to reconcile any conflicting evidence and to determine the true facts, *Patterson v. Ark. Dep't. of Health*, 343 Ark. 255, 33 S.W.3d 151 (2000). Dr. Byrd considered the claimant's right knee condition to be "*pretty asymptomatic*" before the August 2017 compensable injury. (Dr. Byrd's Dep. at 26–27) (Emphasis added). The claimant's supervisor, Mr. Quackenbush, did not provide any evidence the claimant's right knee was symptomatic before August 2017 compensable injury. Here, again, when read and considered in its totality, it is apparent Dr. Byrd's opinion, stated within a reasonable degree of medical certainty, is that the claimant's August 2017 compensable injury was the major cause of his permanent anatomical impairment.

**Percentage of Impairment/Objective Medical Evidence**

Dr. Byrd initially released the claimant to return to work on September 11, 2018 with a permanent impairment rating of 37% to the right lower extremity, based on what he admitted was his own subjective opinion – which was not based on the *AMA Guides* of what he considered to be a "good" surgical result. In his deposition Dr. Byrd candidly admitted he was using the adjective "good" to describe the perceived surgical result colloquially, based on his own common use of the term, and he did not intend to use the term as the *AMA Guides* use it. (RX1 at 47–50; Dr. Byrd's Dep. at 61–62). Thereafter, on July 1, 2019, Dr. Byrd increased the claimant's impairment rating to 50% to the right lower extremity because, upon further reflection and based on the *AMA Guides*, as well as bis own physical examination, he believed the claimant had actually obtained only a "fair" result following his right knee replacement surgery. (CX1 at 9–12; Dr. Byrd's Dep. at 61–63). In his clinic note of July 1, 2019, his letter dated October 29, 2019, and his deposition testimony, Dr. Byrd explains his reasons for increasing the impairment rating from 37% to 50% to the right lower extremity. There exists insufficient evidence in the record finding Dr. Byrd's 50% rating to the right lower extremity was based on any factors other than objective medical evidence: his own physical examination, diagnostic testing, and the applicable *AMA Guides*.

. . . .

There exists a preponderance of the credible evidence of record supporting Dr. Byrd's assessment of a 50% to the right lower extremity permanent impairment rating. The applicable law requires a permanent anatomical rating be based on

objective medical evidence and the *AMA Guides*. Here, there exists insufficient evidence to establish Dr. Byrd failed to do so when he issued the claimant both the initial 37% and the later 50% to the right lower extremity impairment ratings. Indeed, Dr. Byrd: (1) issued the 50% rating at a later date than the 37% rating, and at a time when the full extent of the claimant's permanent anatomical impairment had become evident; (2) reviewed diagnostic tests and conducted a physical examination(s) of the claimant; and (3) changed his mind and determined the claimant had received only a "fair" as opposed to a "good" surgical result pursuant to the *AMA Guides*; and (4) testified in his evidentiary deposition he "stood by" his October 29, 2019 letter in which he opined the claimant's compensable injury was the major cause of his 50% to the right lower extremity rating based on the *AMA Guides*. ( Dr. Byrd's Dep. at 55 ).

. . . .

Once again, based on these facts, any finding the claimant's August 2017 compensable injury was not the major cause of his impairment, and that Dr. Byrd's 50% rating to the right lower extremity was not based on objective medical evidence would constitute sheer speculation and conjecture which, of course, the law does not allow. *See Deana*, *supra*.

Appellants appealed to the Commission. The Commission unanimously affirmed and adopted the ALJ's opinion as its own. This appeal followed. Under Arkansas law, the Commission is permitted to adopt the ALJ's opinion. *SSI, Inc. v. Cates*, 2009 Ark. App. 763, 350 S.W.3d 421. In so doing, the Commission makes the ALJ's findings and conclusions the findings and conclusions of the Commission. *Id*. Therefore, for purposes of our review, we consider both the ALJ's opinion and the Commission's majority opinion. *Id*.

II. *Standard of Review*

In appeals involving claims for workers' compensation, the appellate court views the evidence in the light most favorable to the Commission's decision and affirms the decision if it is supported by substantial evidence. *Prock v. Bull Shoals Boat Landing*, 2014 Ark. 93, 431 S.W.3d 858. Substantial evidence is evidence that a reasonable mind might accept as

adequate to support a conclusion.  *Id*.  The issue is not whether the appellate court might have reached a different result from the Commission, but whether reasonable minds could reach the result found by the Commission.  *Id*.  Additionally, questions concerning the credibility of witnesses and the weight to be given to their testimony are within the exclusive province of the Commission.  *Id*.  Thus, we are foreclosed from determining the credibility and weight to be accorded to each witness's testimony, and we defer to the Commission's authority to disregard the testimony of any witness, even a claimant, as not credible.  *Wilson v. Smurfit Stone Container*, 2009 Ark. App. 800, 373 S.W.3d 347.  When there are contradictions in the evidence, it is within the Commission's province to reconcile conflicting evidence and determine the facts.  *Id*.  Finally, this court will reverse the Commission's decision only if it is convinced that fair-minded persons with the same facts before them could not have reached the conclusions arrived at by the Commission.  *Prock*, *supra*.

III. *Whether the Compensable Right-Knee Injury was the Major Cause of Lindsey's Permanent Disability or Impairment*

Appellants first argue that substantial evidence does not support the Commission's finding that Lindsey's second compensable right-knee injury was the major cause of Lindsey's permanent disability or impairment.  They compare the facts of this case to those in *Hickman v. Kellogg, Brown & Root*, 372 Ark. 501, 277 S.W.3d 591 (2008), and argue that Lindsey cannot claim to be asymptomatic prior to his work injury because his medical records prove otherwise.  Appellants criticize that the ALJ's findings, which were affirmed and adopted by the Commission as its own, "ignor[e] the major cause requirement in the statute which our Supreme Court has addressed."  Appellants direct us to Dr. Crawley's

10

office notes in which Lindsey complained of arthritis symptoms in his right knee and received injections as treatment before the second work–related injury. They further argue that Dr. Byrd initially indicated "Possibly" on their form asking whether the compensable injury was the major cause of the impairment rating and made contradictory statements throughout his deposition.

A compensable injury, found in Arkansas Code Annotated section 11–9–102(4)(A)(i) (Supp. 2021), is defined as "[a]n accidental injury causing internal or external physical harm to the body . . . arising out of and in the course of employment and which requires medical services or results in disability or death. An injury is 'accidental' only if it is caused by a specific incident and is identifiable by time and place of occurrence[.]" We have previously defined "permanent impairment" as "any permanent functional or anatomical loss remaining after the healing period has ended." *Ark. State Mil. Dep't v. Jackson*, 2019 Ark. App. 92, at 9, 568 S.W.3d 811, 817 (quoting *Main v. Metals*, 2010 Ark. App. 585, at 9, 377 S.W.3d 506, 511). Under the statute, any determination of the existence or extent of physical impairment must be supported by objective and measurable findings. Ark. Code Ann. § 11-9-704(c)(1)(B) (Repl. 2012). A claimant will not receive an award for permanent benefits unless the injury was the major cause of the disability or impairment. Ark. Code Ann. § 11-9-102(4)(F)(ii)*(a)*. "Major cause" means more than 50 percent of the cause, which the claimant must establish by a preponderance of the evidence. Ark. Code Ann. § 11-9-102(14)(A); *see also Jackson*, *supra*. If a compensable injury combines with a preexisting disease or condition to cause or prolong disability or a need for treatment, a claimant will not receive an award for permanent benefits unless the injury was the major cause of the

11

permanent disability or need for treatment. Ark. Code Ann. § 11-9-102(4)(F)(ii)*(b)*.

However, an employer takes the employee as he finds him, and employment circumstances

that aggravate preexisting conditions are compensable. *Jackson*, *supra*.

While the respondents rely on *Hickman* as authority for reversing the Commission's

determination that the second injury was not the major cause of the appellant's impairment,

*Hickman* is easily distinguishable. The *Hickman* opinion describes Hickman's preexisting

medical condition in detail prior to his April 26, 2002, compensable injury at issue therein.

> Dr. Sid Bailey, Hickman's treating physician, testified that he examined Hickman's right knee on June 5, 2002, and Hickman had "significant past history" of a "previous injury to that knee" from a dump-truck accident in 1984. Hickman had a previous right-knee surgery, a healed surgical scar, and "mild to moderate synovitis [inflammation] and pain with any attempted active or passive range of motion." According to Dr. Bailey's testimony, Hickman's range of motion was restricted to "thirty percent estimated overall." Dr. Bailey also testified that x-rays revealed "moderate to severe post-traumatic degenerative arthritis with no fracture." He further testified that Hickman's arthritis, as shown on the x-ray, would have existed prior to his April 25, 2002 injury. The arthritis shown on the x-ray included bone spurs and "narrowing."
>
> Dr. Bailey also testified about the findings of the MRI to Hickman's right knee. According to Dr. Bailey's interpretation of the MRI, the "medial meniscus and also the ACL [anterior cruciate ligament]" were absent from the knee prior to the accident on April 25, 2002. He speculated that they were removed by surgery or the knee was injured prior to that time. He added that "[t]he ACL . . . gives stability to the knee so that you don't plant, pivot, turn and collapse with a trick knee that you've seen. And the medial meniscus also gives stability and functions as a pad, if you will, cushion or support between the two bones the femur and the tibia." Based upon these findings, Dr. Bailey concluded that Hickman had a "painful and very inefficient right knee." . . . Finally, in the following colloquy, Dr. Bailey admitted that Hickman's "severe preexisting degenerative changes" in his knee were the major cause of his surgery:
>
>> Q: Doctor, using Mr. Giles's definition of major cause supplied to you in this letter as being more than fifty percent of the cause it remains your opinion today as you told me earlier that Mr. Hickman's severe preexisting degenerative changes of the right knee was the major cause of the surgery and his impairment rating, is that correct.

A: Yes.

*Hickman*, 372 Ark. at 507–08, 277 S.W.3d at 597. Based on the evidence in the record of Hickman's severe preexisting medical condition and the physician's opinion that the major cause of Hickman's surgery and impairment was severe preexisting degenerative changes and not the compensable injury, the *Hickman* court concluded the following:

> Further, there is no evidence that the need for Hickman's knee-replacement surgery and the resulting impairment would not have occurred but for the work-related injury. Based upon the foregoing analysis, as well as our standard of review in viewing the evidence in a light most favorable to the Commission's decision, we conclude that there was substantial evidence to support the Commission's finding that Hickman failed to prove that the April 2002 incident was the major cause of his total-knee-replacement surgery and resulting impairment rating. Accordingly, we affirm the Commission's decision on this point.

*Hickman*, 372 Ark. at 509, 277 S.W.3d at 598.

Contrast the prior medical and work history of the claimant in *Hickman* to that of appellee, Lindsey, herein. Of particular import is the testimony of Robert Quackenbush, Lindsey's direct supervisor. Mr. Quackenbush testified that he had been Lindsey's direct supervisor since 2016. Mr. Quackenbush testified that he worked with Lindsey daily and that he had never observed Lindsey having any "problems with a limp or funny gait or anything like that." Further, Mr. Quackenbush testified that "Tom [Lindsey] and I have worked on countless inventories together in the field and we never had an issue where he had to quit early or go back to the truck." When asked if he ever heard Lindsey complain of pain or inability to walk long distances or any discomfort in his right knee, Mr. Quackenbush unequivocally stated, "No, sir. When Tom and I had work to do, it was

always done without issue."

Mr. Quackenbush was actually with Lindsey when the second injury occurred on August 18, 2017. Mr. Quackenbush testified that they were inspecting a group of new trees and that Lindsey was trying to get a closer look. Mr. Quackenbush stated,

> I was near him . . . and he became tangled up in what we call green briars. That vine was growing on it and he pivoted real hard and made some noticeable audible remarks about, you know, he was in discomfort from that situation and upon that incident, we tried to get back to the truck and he had limited mobility and there was snaps and pops that could be heard from his knee, and at that point, he, basically, used me as a crutch to try to get back to the truck, and the truck was some distance away.

Lindsey's medical history is also in sharp contrast with the medical history of the claimant in *Hickman*. Lindsey sustained a torn meniscus to his right knee in 2011 that was arthroscopically repaired. As seen from Robert Quackenbush's testimony above, the previous knee injury did not affect Lindsey's ability to perform his job duties as a County Ranger III. Not only are the job duties of a County Ranger III strenuous as outlined above, but it is also a requirement for the position of County Ranger III that the employee pass an annual physical examination. This annual examination includes the requirement that the employee must walk one mile within sixteen minutes. The record indicates that Lindsey passed the annual physical examinations.

In the years following Lindsey's first surgery in 2011, Lindsey saw Dr. Michael Crawley, his "family doctor," to fulfill his physical-examination requirements for work. In Dr. Crawley's office notes from those visits in September 2011, August and November 2012, September 2013, and February 2017, Dr. Crawley noted that Lindsey had discussed pain in his right knee to some degree. Lindsey received injections for his knee pain in

14

August 2012, September 2013, and February 2017. Dr. Crawley described the treatments in his deposition:

> So he went, you know, four years, which is a long time with not having to have at least a treatment, from records we have, and then eight months is actually a long time for a shot to work, so I would say he, pretty much, he had one treatment from 2013 to 2017, that's a pretty asymptomatic arthritic knee in my opinion. He had a flare-up, sounds like, in February of 2017. Shot helped. Most shots work two or three months; he may have symptoms, but at least from what he has told us and seeking treatment, he didn't seek treatment again until his injury, so eight months is a long time to go with one shot. So, I would say, before that it was 2013, that's a long time with only one treatment, I would say that is an asymptomatic knee arthritic -- or arthritic knee that had one little flare-up in February [of 2017], is my opinion.

The opinions and deposition testimony of Lindsey's orthopedic surgeon, Dr. Byrd, carry particular weight. We acknowledge that Dr. Byrd responded to a letter from the Arkansas Insurance Department on November 8, 2018, that stated the second injury was "possibly" the major cause of Lindsey's impairment. However, Dr. Byrd then responded to a letter from Lindsey's attorney on August 6, 2019, and stated that "yes," the second injury was the major cause of Lindsey's impairment. While one may argue these two letters are inconsistent, Dr. Byrd wrote an additional letter and testified by deposition. Dr. Byrd concluded in his letter dated October 29, 2019, "I do believe within a medical degree of certainty that the 2017 injury is the major cause to Mr. Lindsey's permanent impairment and not a pre-existing condition." Further, Dr. Byrd testified in his deposition that he stood by his October 2019 letter opining that the second compensable work injury was the major cause for Lindsey's knee surgery and that the impairment rating was "based off having the knee replaced"—not for the underlying condition. When there are contradictions in the evidence, it is within the Commission's province to reconcile conflicting evidence and to determine the true facts. *Associated Bldg. & Dev. v. Newby*, 2009 Ark. App. 748. The

Commission is not required to believe the testimony of the claimant or any other witness but may accept and translate into findings of fact only those portions of the testimony that it deems worthy of belief. *Id.*

Having determined that *Hickman* is easily distinguishable, we find that the facts of this case are more comparable to those in *Newby*. In *Newby*, we affirmed the Commission's finding that Newby's work-related injury was the major cause of his impairment to his left shoulder. *Newby*, 2009 Ark. App. 748. Prior to his work-related injury, Newby had preexisting arthritis in his left shoulder, and a medical record indicated that Newby had pain and a limited range of motion in his shoulders. Nevertheless, the Commission adopted the ALJ's findings that Newby's compensable injury was the major cause of his impairment on the basis of Newby's credible testimony and the medical evidence that Newby was not in any need of a surgical procedure prior to the injury and that Newby's symptoms were not severe enough to require surgery. In affirming, we agreed and noted that Newby was able to perform very physical work daily and that his prior symptoms were not severe enough to require surgery. *Id.* Further, we also noted that Newby's treating physician observed that Newby suffered an exacerbation of a chronic condition. *Id.* Thus, we concluded that the Commission's finding was supported by substantial evidence. *Id.*

Even if we might have weighed the evidence differently, considering our standard of review, we cannot say that fair-minded persons with the same facts before them could not have reached the conclusions arrived at by the Commission. Thus, we cannot say that the Commission's finding that Lindsey's 2017 compensable work-related injury was the

16

major cause of his impairment was not supported by substantial evidence, and we affirm on this point.

IV. *Whether the Permanent Impairment Rating is Supported by Objective Medical Evidence*

Appellants next argue that substantial evidence does not support the Commission's findings that Lindsey is entitled to a 50 percent permanent anatomical-impairment rating to the right lower extremity because the rating was not supported by objective and measurable physical findings. They allege that Dr. Byrd initially assigned a 37 percent impairment rating but subsequently changed the rating to 50 percent as a result of Lindsey's subjective complaints of pain. Therefore, appellants argue that because subjective complaints of pain are prohibited from being considered, substantial evidence cannot support the 50 percent impairment rating. We disagree.

Any determination of the existence or extent of physical impairment shall be supported by objective and measurable physical or mental findings. Ark. Code Ann. § 11-9-704(c)(1)(B). "Objective findings" are those findings that cannot come under the voluntary control of the patient. Ark. Code Ann. § 11-9-102(16)(A)(i). Medical opinions addressing compensability and permanent impairment must be stated within a reasonable degree of medical certainty. Ark. Code Ann. § 11-9-102(16)(B). Although our legislature has required that a compensable injury be established by medical evidence supported by objective findings, such evidence is not required to establish each and every element of compensability. *Emergency Ambulance Servs. v. Pritchard*, 2016 Ark. App. 366, 498 S.W.3d 774. The statutes provide that "[w]hen determining physical or anatomical impairment, neither a physician, any other medical provider, an administrative law judge, the Workers'

17

Compensation Commission, nor the courts may consider complaints of pain." Ark. Code Ann. § 11-9-102(16)(A)(ii)*(a)*. Also, "[f]or the purpose of making physical or anatomical impairment ratings to the spine, straight-leg-raising tests or range-of-motion tests shall not be considered objective findings." Ark. Code Ann. § 11-9-102(16)(A)(ii)*(b)*. However, in addressing an impairment rating, we have held that there was no requirement that medical testimony be based solely or expressly on objective findings, only that the medical evidence of the injury and impairment be supported by objective findings. *Singleton v. City of Pine Bluff*, 97 Ark. App. 59, 244 S.W.3d 709 (2006). Finally, the Commission, although authorized to decide which portions of the medical evidence to credit and to translate the evidence into a finding of permanent impairment using the *AMA Guides*, may assess its own impairment rating rather than rely solely on its determination of the validity of ratings assigned by physicians. *Pritchard*, *supra*.

In conformance with this law, our supreme court previously held that the Commission properly found that a claimant was not entitled to an impairment rating for his nerve injuries where the rating established by the doctor was based *solely* on the claimant's level of pain. *Multi-Craft Contractors, Inc. v. Yousey*, 2018 Ark. 107, 542 S.W.3d 155. However, we have previously held that when there are objective findings, it is improper for the Commission to reject an impairment rating for the reason that it was based, in part, on subjective findings. *Eldridge v. Pace Indus., LLC*, 2021 Ark. App. 245, 625 S.W.3d 734. In *Singleton*, although the requirement of evidence of injury supported by objective findings had been satisfied, the Commission rejected the medical opinion offered by Dr. Baskin that Singleton's ankle injury resulted in an 8 percent anatomical impairment rating simply

because it was based, in part, upon nonobjective evidence. *Singleton, supra*. After ignoring objective and subjective findings, the Commission in *Singleton* denied benefits for an impairment rating, finding that Singleton "miraculously . . . sustained no permanent structural damage . . . ." *Singleton*, 97 Ark. App. at 61, 244 S.W.3d at 711. We reversed and remanded, holding that that, in light of an existing objective finding, the Commission arbitrarily and improperly rejected subjective evidence in determining that appellant sustained no anatomical impairment as a result of his ankle injury. *Singleton, supra*.

Here, Lindsey sustained a compensable work-related injury to his right knee, requiring him to undergo total-knee-replacement surgery. In assigning a permanent anatomical-impairment rating, Dr. Byrd admitted that his opinion was based on a combination of subjective and objective factors. He further explained in his deposition that when he calculated the impairment ratings using the *AMA Guides*, not only did he consider what Lindsey had told him on the day that he saw him, but his findings were also based "on [an] exam." Dr. Byrd specifically testified that he reevaluated Lindsey for a second impairment rating because "he [Lindsey] wasn't as good as he was when we first released him, so, because he started having issues again, whether that was because he got back to work and was doing more, or whatever, I don't know, but it wasn't the same result, the exam was not the same as it was when we released him the first time." Because we have previously held that it is improper for the Commission to reject an impairment rating for the reason that it was based, in part, on subjective findings and where Dr. Byrd's testimony indicated that he also based his rating on objective findings, we cannot say that fair-minded persons with the same facts before them could not have reached the conclusions arrived at

by the Commission. Thus, under our standard of review, the Commission's decision that Lindsey was entitled to a 50 percent permanent anatomical-impairment rating to the right lower extremity is supported by substantial evidence; accordingly, we affirm.

Affirmed.

HARRISON, C.J., and MURPHY, J., agree.

*Charles H. McLemore Jr.*, for appellant Public Employee Claims Division.

One brief only.